# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FINDERS KEEPERS USA LLC**<br>109 High Street<br>Clearfield, Pennsylvania 16830<br><br>    Plaintiff,<br><br>  v.<br><br>**U.S. DEPARTMENT OF JUSTICE,**<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, for injunctive, declaratory, and other appropriate relief. Plaintiff Finders Keepers USA LLC ("Finders Keepers") challenges the failure of the Federal Bureau of Investigation ("FBI"), a component of the U.S. Department of Justice ("DOJ"), to provide Plaintiff with any records or justification for withholding any records in response to the expedited FOIA request Plaintiff filed over three and one-half years ago. With its request Plaintiff seeks to confirm the FBI's recovery of Civil War-era gold buried in the mountains of Pennsylvania, based in significant part on scientific evidence of the gold's existence that Plaintiff provided the FBI.

2. This case seeks declaratory relief that DOJ is in violation of the FOIA, specifically, 5 U.S.C. § 552(a)(3)(A), for failing to provide Finders Keepers all responsive records and 5 U.S.C. § 552(a)(6)(A), for failing to make a determination on Finders Keepers' request either on an expedited basis or within 20 business days, as well as injunctive relief

ordering defendant DOJ to process and release to Finders Keepers immediately and at no cost the requested records in their entirety.

## Jurisdiction and Venue

3. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). The Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201(a), and 2202. Venue in this district is proper under 5 U.S.C. § 552(a)(4)(B).

## Parties

4. Plaintiff Finders Keepers is a lost treasure locate-and-recovery service located in Clearfield, Pennsylvania.

5. Defendant DOJ and its component the FBI are an agency within the meaning of 5 U.S.C. §§ 552(f)(1) and 701(b)(1). DOJ has possession and control of the requested records and is responsible for fulfilling Plaintiff's FOIA request.

## Statutory and Regulatory Background

6. The FOIA, 5 U.S.C. § 552, requires agencies of the federal government to release requested records to the public unless one or more specific statutory exemptions apply.

7. An agency must respond to a party making a FOIA request within 20 working days, notifying that party of at least the agency's determination of which of the requested records it will release, which it will withhold and why, and the requester's right to appeal the determination to the agency head. 5 U.S.C. § 552(a)(6)(A)(i).

8. An agency's failure to make this determination within 20 business days is subject to judicial review without exhausting administrative remedies. 5 U.S.C. § 552(a)(6)(C)(i).

9. In "unusual circumstances" an agency may extend the time to respond to a request

by no more than 10 working days provided that the agency gives the requester written notice setting forth the unusual circumstances and the date on which the agency expects to make a determination. 5 U.S.C. § 552(a)(6)(B)(i)-(iii). The FOIA defines "unusual circumstances" as including the need to search for and collect responsive records from offices other than the office processing the request; the need to search for, collect, and examine a "voluminous amount of separate and distinct records"; and the need to consult with another agency. 5 U.S.C. § 552(a)(6)(B)(iii)(I)–(III).

10.     The FOIA also requires agencies to promulgate regulations that provide for expedited processing of FOIA requests where the requester demonstrates a "compelling need" as well as "other cases determined by the agency." 5 U.S.C. § 552(a)(6)(E)(i).

11.     DOJ's FOIA regulations provide for expedition for, among other things, "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e)(1)(iv). Requesters seeking expedition under this subsection must submit their expedition request to DOJ's Director of Public Affairs. 28 C.F.R. § 16.5(e)(2).

12.     Agencies are required to make a determination on a request for expedition within 10 calendar days "after the date of the request." 5 U.S.C. § 552(a)(6)(E)(ii)(I); 28 C.F.R. § 16.5(e)(4).

13.     Failure to respond within this 10-day period is subject to judicial review without exhausting administrative remedies. 5 U.S.C. § 552(a)(6)(E)(iii). Agency decisions to deny a request for expedition are subject to judicial review "based on the record before the agency at the time of the determination." 5 U.S.C. § 552(a)(6)(E)(iii).

## Factual Background

14. Dennis and Kem Parada, a father and son team of treasure hunters who co-own Finders Keepers, have searched for many years for Civil War-era gold rumored to be buried in Elk County, Pennsylvania. According to folklore—as well as newspaper and magazine articles dating back to the 1960s and 1970s—a shipment of gold transported by Union soldiers on their way to the U.S. Mint in Philadelphia was stolen and buried somewhere in the hills of Elk County.

15. A story discovered in the archives of the Army Heritage and Education Center at the Military History Institute in Carlisle, Pennsylvania, *The Lost Ingot Treasure*, provides further details about the buried gold. That story recounts a trip allegedly made in early June 1863 by a caravan of wagons and armed horsemen, led by Lieutenant Castleton, carrying 26 gold ingots painted black. According to the story, upon becoming ill Castleton paid another man to guide the group in the Pine Ridge country. The group became lost, and Castleton along with five others transported the gold-laden wagons south. Castleton and the men were never seen again and while their abandoned wagons were discovered the gold was missing.

16. Investigative journalist Warren Getler, who co-authored the book *Rebel Gold: One Man's Quest to Crack the Code Behind the Secret Treasure of the Confederacy*, has shed further light on the true meaning of *The Lost Ingot Treasure* based on his substantial research into the operations of the Knights of the Golden Circle ("KGC"). The KGC was a Southern-based secret society that sought to form a separate confederation of slave states, funded in part by robbing banks as well as commandeering transports carrying federal gold. Reportedly the KGC, the Confederate underground, was able to amass very significant amounts of gold, silver,

and arms. The KGC, including its northern Copperhead arm, buried its ill-gotten gains in secret caches, leaving behind carved symbols and codes as guides to the location of the buried treasures—so-called "waybills." Its key symbols included, among others, the rising sun, hearts, turtles, and turkey tracks.

17. The story *The Lost Ingot Treasure* appears to be one of these waybills, providing details about the likely location of a hidden cache of stolen gold at Dents Run in Elk County, Pennsylvania. The very detailed geographic references in the story, such as the ridge running north and south of the east branch of Hicks Run where the abandoned party supposedly was camped, point to the precise area of the Paradas' exploration in Elk County.

18. Armed with metal-detecting instruments, the Paradas began exploring the Dents Run area starting in 2004. The Paradas and their associates made approximately 300 visits to the Dents Run site. Using a variety of metal detecting instruments, including a Ground Penetrating Locator (the GPL 200 resistivity meter) and a Surface Ground Penetrating Radar (GPR) system, they detected a large cache of metal in an underground chambered cave. The "resistivity" readings they obtained from more than 100 remote, surface-based scans with the GPL 200 over a three-year period suggested the highly-conductive metal was gold. In addition, while drilling a small inspection borehole at the site, what appeared to be specks a gold colored material, and specks of a gold-colored material were found on a drill bit that had gotten stuck, although the material was too small to test.

19. The Dents Run site is on forest land owned by the Commonwealth of Pennsylvania. In 2010, the Paradas received permission from the Pennsylvania Department of Conservation and Natural Resources ("DCNR") to probe the site with non-invasive systems and to use small-scale drills to explore the subsurface for indications of metal. The DCNR revoked

that permission in 2012. A camera the Paradas had installed at the Dents Run Site subsequently captured what appeared to be DCNR staff digging near the targeted gold site and it appears that something was removed.

20. On January 26, 2018, the Paradas and Mr. Getler met with two FBI agents from the FBI's Art Crime Team and an Assistant United States Attorney at the U.S. Attorney's Office in Philadelphia. The Paradas and Mr. Getler requested the meeting to inform the U.S. government about their detection of a large amount of metal in an underground cave in the Dents Run area that their metal-detecting instruments suggested was gold. They informed the FBI and the U.S. Attorney's Office about geophysical detection and identification issues concerning the gold, as well as its possible provenance as a rumored cache of Civil War-era gold stolen from the U.S. government. The Paradas also described the bureaucratic battle in which they had been engaged with the DCNR over their ability to probe the Dents Run site with non-invasive detection systems and to use small-scale drills to explore the subsurface.

21. At that meeting Mr. Getler explained the immense historical significance should the cache of gold be recovered and the likely high monetary value of what was estimated to be 12 cubic feet of gold. Both the Paradas and Mr. Getler stated their expectation to be allowed to witness any dig to fully account for the amount, weight, condition, purity, and provenance of any Civil War-era gold recovered.

22. After hearing from the Paradas and Mr. Getler one of the FBI agents expressed clearly that if the gold were in Dents Run the FBI would seize it as U.S. property. Dennis Parada expressed his understanding of the gold's provenance but also noted he would be petitioning for a finders' fee, to which the FBI agent replied, "Fair enough." When the meeting ended the FBI indicated it would be back in touch with the Paradas and Mr. Getler.

23. Days later, the FBI requested to meet the Paradas and Mr. Getler at the Dents Run site, a meeting that was scheduled for January 31, 2018. On that date seven FBI agents showed up to meet with the Paradas and Mr. Getler. The Paradas deployed their GPL 200 system, which resulted in a resistivity reading strongly suggestive of gold.

24. In the days following the January 31 meeting at Dents Run, the special agent in charge and Mr. Getler discussed the technology that should be used for a more accurate identification of what was buried at the Dents Run site. Mr. Getler, who also is a former executive at an advanced underground detection and analytics start-up in Washington, D.C., suggested using one of three systems: the EM 31 and GEM-2, both of which are handheld devices that had been used by the U.S. military in Iraq, and a gravimeter, which is extremely sensitive and the optimal choice when searching for a large dense mass in a narrow, small-scale sedimentary-rock area such as Dents Run. Mr. Getler also recommended several geophysical engineering firms in the region that had advanced detection systems.

25. Based on Mr. Getler's recommendations, the FBI selected Enviroscan of Lancaster, Pennsylvania to do the underground detection survey with a gravimeter. Enviroscan (now Rettew Associates) is a well-recognized and highly respected geophysical engineering company. Its lead engineer, Dr. Tim Bechtel, currently serves as an associate professor at Franklin & Marshall College and recently won a top award from the Geological Society of America. Mr. Bechtel previously had deployed a gravimeter in some of Envirosan's geo-survey work for the U.S. Army Corps of Engineers.

26. On February 26, 2018, four FBI agents, the Paradas, Charlie Rhine—the chief project manager of Enviroscan—and an Enviroscan technician conducted on onsite survey at the Dents Run site using the highly sensitive gravimeter. The Enviroscan team placed 50-60 marker

flags around the target location and then took 50 readings with the gravimeter over a six-hour period. The gravimeter recorded a very large, dense object in the middle of the grid.

27. In the first week of March 2018, the FBI special agent in charge notified Mr. Getler and Dennis Parada that the results from the gravimeter scan were positive for gold and indicated the metal target it had detected was about seven to nine tons in mass with a density value of 18-19. By comparison the surrounding sandstone and clays at the site have densities around 2-3. Gold, in fact, is an outlier as it has one of the highest densities of any mineral. The gravimeter readings Enviroscan took on site were consistent with the measurements the Paradas had obtained with the GPL 200, which estimated a volume of seven tons.

28. On March 9, 2018, FBI Special Agent Jacob B. Archer filed an application for a warrant to seize property subject to forfeiture in the U.S. District Court for the Eastern District of Pennsylvania, *In the Matter of the Seizure of One or More Tons of United States Gold*, Case No. 18-361-M (E.D. Pa.) ("Seizure Application") (attached as Exhibit A). The Seizure Application described the property to be seized as "[a]pproximately one or more tons of gold belonging to, and stolen from, the United States Mint, and located in the Dents Run Site, in Elks County, Pennsylvania." *Id.*

29. The Seizure Application was based, in large part, on information provided to Special Agent Archer by three individuals identified as "Person 1" and "Person 2"—a father and son who have spent significant time searching for gold purportedly buried in Elk County Pennsylvania—and "Person 3"—an author of a book on the operations of the Knights of the Golden Circle.  *Id.* ¶¶ 13, 21. On information and belief Person 1 is Dennis Parada, Person 2 is his son Kem Parada who together own Finders Keepers, and Person 3 is investigative journalist and author Warren Getler, based in Washington, D.C.

30. The Seizure Application explained the historical background to the hidden cache of gold. According to Clearfield Pennsylvania folklore, soldiers carrying as much as 26 gold ingots from San Francisco to the U.S. Mint in Philadelphia got lost in the woods of Elk County and buried the gold. Seizure Application, ¶ 13b. A document from the archives of the Army Heritage and Education Center at the Military History Institute in Carlisle, Pennsylvania—*The Lost Ingot Treasure*—appears to confirm this story. *Id.* ¶¶ 21-22. Evidence found at the Dents Run site also confirms aspects of the story, including artifacts possibly dating back to the 19th century. *Id.* ¶ 20(j)(3).

31. In fact, as explained by the Seizure Application, this story appears to be a waybill created by the KGC to indicate the location of buried gold. Seizure Application ¶¶ 21-22. Special Agent Archer's own observations corroborated that the *Lost Ingot Treasure* is a waybill identifying the location of buried gold. *Id.* ¶ 23. He also consulted with the National Archives and the U.S. Mint to corroborate the provenance of the Dents Run gold as belonging to the United States and likely stolen while being transported between U.S. Mint facilities. *Id.* ¶¶ 21-22.

32. The Seizure Application described the scientific evidence supporting the existence of Civil-war era gold at the Dents Run site, including resistance testing results obtained by the Paradas and Enviroscan. Seizure Application ¶¶ 13(j)(4) and (5), 15-18.

33. Special Agent Archer delineated seven facts that gave him "probable cause to believe that a significant cache of gold is secreted in the underground cave located at GSP coordinates on the Dents Run Site." *Id.* ¶ 26. They include: (1) GPR and GPL readings indicating the presence of non-ferrous metal and a large quantify of gold; (2) indications from a two-box metal detector that non-ferrous metal in a five feet by three feet area was present at the Dents Run site; (3) GPL resistivity readings from January 31, 2018, that indicate the presence of gold;

(4) the gravimeter results indicating the presence of a mass of gold weighing multiple tons; (5) observations of gold specks on a drill bit; (6) his review of a publication discussing the fact that gold in Pennsylvania is not visible to the naked eye and generally recoverable through a refining process; and (7) his search of data indicating that no naturally occurring gold is found in Elk County. *Id.*

34. Special Agent Archer also delineated six factors that gave him probable cause that the buried gold was stolen from and belongs to the United States. *Id.* ¶ 27. They include: (1) results of Enviroscan's microgravity survey; (2) information from the U.S. Mint that during the Civil War only the U.S. Mint possessed large amounts of purified gold; (3) information from the U.S. Mint that it was the only entity purifying large quantities of gold during the Civil War; (4) information from the American Numismatics Society and his own research that there were no large-scale private mint producers during the Civil War; (5) National Archives records indicating that the U.S. Mint in San Francisco produced significant amounts of troy ounces of gold for the year ending in 1863; and (5) bills of lading indicating the shipments via ship and land passage between the U.S. Mint in San Francisco and the U.S. Mint in Philadelphia. *Id.*

35. The Seizure Application also explained why a seizure warrant is necessary to prevent the unlawful seizure of the stolen gold as abandoned property by the DCNR, "which would necessitate unnecessary litigation and expense to obtain the return of United States property." Seizure Application ¶ 29. Special Agent Archer based his concerns on the interactions between the Paradas and the DCNR. *Id.*

36. On March 9, 2018, U.S. Magistrate Judge Richard S. Lloret granted the FBI's application for a warrant to seize the Dents Run gold. (Exhibit A). The warrant gave the FBI up

to 30 days to execute the warrant and directed the FBI to do so "in the daytime 6:00 a.m. to 10:00 p.m." *Id.*

37. The following day the FBI notified the Paradas and Mr. Getler that the dig to recover the gold would take place on March 13. The three repeated their desire to be on-site during the dig and were assured by the special agent in charge that they would be allowed on site.

38. On March 13, 2018, the Paradas and Mr. Getler arrived at the Dents Run site at 8:00 a.m., as directed. They observed as many as 25 FBI vehicles parked along the road. Contrary to what the FBI had told them earlier, the three were not allowed to go to the site where the dig was to take place and instead were directed to remain in their car, where they sat for the next six hours. Finally, at 2:00 p.m. they were escorted up the hill where they observed a large assembly of approximately 30 FBI agents including a photographer/videographer. Then at approximately 3:00 p.m. the agent in charge declared the dig over for the day, even though it was not yet dark. At that point the FBI had dug six feet down; the target gold was believed to be located approximately 10 to 12 feet below the surface.

39. The three returned to the site the following morning at 8:15 a.m. where once again the FBI directed them to remain in their car. The agent in charge advised them that renewed excavation would be delayed due to water accumulation in the pit. At 1:30 p.m. he led the Paradas and Mr. Getler to the top of the hill where they observed 30 or more FBI agents standing near a deep, fully excavated hole at a depth of approximately 13 feet. The FBI agent in charge noted that nothing was in the hole but refused to answer Dennis Parada's question as to whether they had found any gold. Upon leaving the site at 3:30 they were directed by the agent in charge to not speak a word about the dig to anyone "or there will be serious repercussions."

40. Neither Mr. Getler nor the Paradas have heard from the FBI agent in charge since the Dents Run dig.

41. Mr. Getler and Dennis Parada reached out to staff at Enviroscan to ascertain why Enviroscan's gravimeter readings proved to be so inaccurate. They stated that they were under contract with the FBI and could not talk about the dig. Mr. Getler was able to talk to Mr. Rhine from Enviroscan the day following the dig, who indicated his belief in the target being gold shot up "beyond 50 percent" after the density projections, based on sophisticated algorithms that Enviroscan had used to process the raw data that yielded high values in a range indicating the presence of gold, notably 18-19.5, with 19 indicating 24 karat gold.

42. Mr. Getler and Dennis Parada also reached out to the owner of the excavator company used by the FBI for the dig, who also stated that he could not comment because of the company's contractual agreement with the FBI.

43. A few days after the FBI completed its dig at Dents Run, an off-duty Pennsylvania police officer told the Paradas and Mr. Getler that he had witnessed two "Brinks" type armored trucks supported by two Humvees and a black SUV with satellite communication antennae driving from the Dents Run area past the nearby town of Weedville at approximately 10:00 a.m. on March 14, 2018. Heather Selle of Weedville subsequently provided a similar account to the three, adding that the satellite truck had the marking "FBI" on it and that the armored vehicles had the words "FBI Police" on them and appeared to be like a Lenco BearCat model, which is capable of transporting more than two tons of weight. She also described seeing three white SUVs marked as FBI Police heading later that day to Dents Run at around 5:00 p.m. Other area residents described seeing a variety of vehicles, including an armored vehicle, and one eyewitness described the roads leading in and out of Dents Run as barricaded by FBI Police

on the evening of March 13, 2018—hours after the FBI told the Paradas and Mr. Getler the dig was finished for the day—and again around 6:00 p.m. on March 14, 2018. On the evening of the 14th the FBI required local residents to stay in their homes.

44. In a videotaped interview on September 20, 2018, with the *Associated Press* Cheryl Elder, whose home lies close to the Dents Run site, described loud and disruptive excavation activity by heavy equipment on the evening of March 13, 2018, starting at around 8:30 p.m. The activity was still ongoing when she fell asleep at about 2:00 a.m.—long after the 10:00 p.m. deadline imposed by Magistrate Judge Lloret. Ms. Elder also described black unmarked SUVs and trucks moving back and forth in the Dents Run area that evening, and various six-wheel All Terrain Vehicles coming down the slope to meet them.

*The FOIA Request At Issue*

45. On May 8, 2018, Attorney William Cluck on behalf of Finders Keepers submitted a FOIA request to the FBI (Exhibit B). Specifically, Finders Keepers requested the following records from January 15, 2018, to the present:

> (1) Copies of all public records pertaining to the FBI's investigation of an alleged missing shipment of gold purportedly buried in Pennsylvania state forest land in Dents Run, Elk County, Pennsylvania;
> (2) Copies of all documents relied upon in support of a request to the Federal Court in Pittsburgh for authorization to dig at the site in Dents Run;
> (3) Copies of all communications with Enviroscan pertaining to scientific sampling and analysis of Dents Run, including the report on the Enviroscan findings;
> (4) Copies of all requisitions for expenditures associated with the investigation at Dents Run;
> (5) Copies of the inventory of items collected from the Dents Run site; and
> (6) Copies of authorization for FBI agents to commence an investigation of the purported missing shipment of gold.

46. By letter dated May 23, 2018, the FBI responded to the request indicating that after a search of its Central Records System it was unable to identify any main file records responsive to Plaintiff's request.

47. Plaintiff then sought the assistance of U.S. Senator Pat Toomey, and his office sent a letter to DOJ on behalf of Finders Keepers on June 8, 2018. DOJ's Office of Information Policy ("OIP") treated the letter as an administrative appeal by Finders Keepers and by letter dated September 10, 2018, advised Plaintiff that it was remanding its request to the FBI to conduct a further search for responsive records.

48. By letter dated October 20, 2018, the FBI advised Plaintiff that the records responsive to its request are law enforcement records and that in view of a pending or prospective law enforcement proceeding release could reasonably be expected to interfere with enforcement proceedings. The FBI stated that as a result it was administratively closing Plaintiff's request.

49. On January 28, 2019, Plaintiff administratively appealed the FBI's October 20, 2018 denial of its request. Plaintiff explained that the gold at issue purportedly was stolen over 100 years ago and that, accordingly, it is difficult to believe there is an ongoing investigation of the circumstances related to that crime.

50. By letter dated July 2, 2019, OIP advised Plaintiff that after carefully considering its appeal, and as a result of discussions with FBI personnel it was remanding Plaintiff's request to the FBI for further processing of the responsive records.

51. By letter dated August 6, 2019, the FBI notified Plaintiff that it had located approximately 2,378 pages of records and 17 video files potentially responsive to Plaintiff's FOIA request. The FBI estimated the cost of processing as approximately $325 for CD releases

or $368.90 for paper releases. By letter dated August 8, 2019, Plaintiff confirmed its willingness to pay the requested fees.

52. In subsequent email exchanges the FBI requested that Plaintiff narrow the scope of its request, which Plaintiff declined to do without an index of the responsive files. Following this exchange by email dated September 23, 2019, the FBI advised that it was moving forward with processing Plaintiff's request as initially submitted.

53. In response to Plaintiff's subsequent request for an update the FBI responded on December 9, 2020, that the request was awaiting an assignment to a disclosure analyst and had an estimated completion date of March 2024.

54. On March 8, 2021, in response to another request for an update, the FBI advised Plaintiff that no one had yet been assigned to review the responsive records.

55. By letter dated March 10, 2021, Plaintiff requested from DOJ's director of Public Affairs that DOJ expedite its request. As Plaintiff explained, its request now involves a matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity that affect public confidence. In support Plaintiff cited four recent news articles— https://www.pennlive.com/news/2021/01/did-the-fbi-find-400m-in-civil-war-gold-in-a-pa-forest-harrisburg-lawyer-says-he-has-new-clue-in-the-case.html;https://www.foxnews.com/us/civil-war-gold-treasure-hunters-lawyer-say-fbi-acting-suspicious-in-wake-of-dig-at-pennsylvania-site; https://www.pennlive.com/news/2019/10/did-the-fbi-find-a-fabled-cache-of-lost-civil-war-gold-pa-court-order-might-help-treasure-hunters-find-out.html; https://www.washingtonpost.com/business/technology/emails-fbi-was-looking-for-gold-at-pennsylvania-dig-site/2021/03/08/96ae38f4-8056-11eb-be22-32d331d87530_story.html. Plaintiff further explained that the news coverage and Plaintiff's own

investigation revealed significant questions about the FBI's integrity, noting that the FBI had spent considerable tax dollars on the gold recovery venture.

56. By letter dated April 5, 2021, the FBI advised Plaintiff that its request for expedition was denied.

57. According to the FBI's web page, last updated on December 8, 2021, "the FBI's FOIPA Program has identified potential responsive information to [Plaintiff's] request(s) and awaits assignment to a Government Information Specialist (GIS) for further processing."

58. Under 5 U.S.C. § 552(a)(6)(C)(i), Plaintiff has now effectively exhausted all applicable administrative remedies with respect to its request of DOJ.

## PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE
### (Wrongful Withholding of Non-Exempt Records)

59. Plaintiff repeats and re-alleges paragraphs 1-58.

60. Plaintiff properly asked for records within the custody and control of the U.S. Department of Justice.

61. Defendant Department of Justice wrongfully withheld agency records requested by Plaintiff by failing to comply with the statutory time limit for making a determination on plaintiff's request, and by withholding from disclosure records responsive to Plaintiff's request.

62. Plaintiff Finders Keepers is therefore entitled to injunctive and declaratory relief with respect to the immediate processing and disclosure of the records requested in its May 8, 2018 FOIA request at no cost to Plaintiff.

### CLAIM TWO
### (Failure to Grant Expedition)

63. Plaintiff repeats and re-alleges paragraphs 1-62.

64. Plaintiff properly asked that DOJ expedite the processing of Plaintiff's FOIA request based on its showing of widespread and exceptional media interest in the requested records, which involves possible questions of the government's integrity that affect public confidence.

65. Despite satisfying the requirements for expedition, Defendant DOJ denied Plaintiff's request for expedition.

66. Plaintiff has constructively exhausted all applicable administrative remedies with respect to defendant's failure to make a determination on Plaintiff's request for expedition.

67. Plaintiff therefore is entitled to injunctive and declaratory relief with respect to the immediate and expedited processing and disclosure of the requested records.

## **Requested Relief**

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Order Defendant Department of Justice and its component the FBI to immediately and fully process Plaintiff's May 8, 2018 FOIA request to the FBI and to disclose all non-exempt documents immediately and at no cost to Plaintiff;

(2) Issue a declaration that Plaintiff is entitled to immediate processing and disclosure of the requested records;

(3) Provide for expeditious proceedings in this action;

(4) Retain jurisdiction of this action to ensure no agency records are wrongfully withheld;

(5) Award Plaintiff its costs and reasonable attorneys' fees in this action; and

(6) Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

_/s/ Anne L. Weismann_
Anne L. Weismann
(D.C. Bar No. 298190)
5335 Wisconsin Avenue, N.W., Suite 640
Washington, D.C. 20015
Phone: 301-717-6610
Weismann.anne@gmail.com

Dated: January 4, 2022                              *Attorney for Plaintiff*

18