UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FINDERS KEEPERS USA LLC,

      Plaintiff,

          v.

UNITED STATES DEPARTMENT OF JUSTICE,

      Defendant.

Civil Action No. 1:22-cv-009-APM

## DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), Federal Bureau of Investigation ("FBI"), Winchester, Virginia. I joined the FBI in September 2011, and prior to my current position, I was the Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of the General Counsel, Freedom of Information Act ("FOIA") Litigation Unit, from September 2011 to November 2012. In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act ("FOIPA") litigation cases nationwide. Prior to my joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration ("DEA") from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits nationwide. I also served as a U.S. Army Judge Advocate General's Corps

1

Officer in various assignments from 1994 to September 2006 culminating in my assignment as Chief, General Litigation Branch, U.S. Army Litigation Division where I oversaw FOIPA litigation for the U.S. Army. I am an attorney licensed in the State of Ohio and the District of Columbia.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 240 FBI employees, supported by approximately 86 contractors, who staff a total of ten (10) Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552. Specially, I am aware of the FBI's handling of Plaintiff's FOIA request at issue in this case. The FBI submits this Declaration to address issues raised by this Court's Scheduling Order dated April 18, 2022, concerning the production rate, prioritization of processing responsive records, and a future order forthcoming as to the production rate of responsive video material. (ECF No. 15.) Pursuant to the Court's Order, the FBI will process at a rate of 1,000 pages per month with the first production by May 18, 2022

(30 days from the date of the Order), prioritizing production of the responsive Enviroscan report and the photographs before processing the remaining documents and provide non-exempt records at no cost to Plaintiff. The Court did not rule on the videotapes, stating that they shall be subject to a later order. The purpose of this declaration is two-fold. First, this declaration will clarify how many responsive videos the FBI will process in response to Plaintiff's request. Second, this declaration will provide an explanation for and request reasonable time to process these videos after processing of all other documents is complete.

**VOLUME OF RESPONSIVE VIDEOS**

(4)     The FBI has determined, in response to Plaintiff's request, that there are four (4) videos totaling approximately 3 hours, 46 minutes, 52 seconds. *See* ECF, Document 12, Joint Status Report ("JSR"), dated March 18, 2022. Plaintiff represented in the JSR that according to an FBI processing cost estimate fee letter dated August 6, 2019, received by the Plaintiff, the FBI alleged it had "17 video files" potentially responsive to Plaintiff's FOIA request in addition to 2,378 responsive pages of records. *See* **Ex. A.** Plaintiff further notes that in the Defendant's Answer filed in response to Plaintiff's Complaint, the Defendant admitted the contents of the letter. *See* ECF, Document 10, Answer ¶ 51.

(5)     As to production costs estimated specifically for processing the media located in response to Plaintiff's FOIA request, the FBI advised, "The FBI located video files that are potentially responsive to the subject of your request. If all of the potentially-responsive media is released, you will owe $255.00 (17 CDs at $15.00 each)." The FBI did not indicate that it had located 17 videos; instead, the intent of the language in the FBI's letter was to inform Plaintiff that with regard to production cost estimates for media, it could take up to 17 CDs to produce the

videos.[1]  For purposes of clarification, there are four (4) potentially responsive videos and based on the FBI's interim release policy for media, non-exempt information will be provided across an estimated 17 monthly productions of one CD per month.

(6)     The FBI has determined the four (4) responsive videos contain approximately 3 hours, 46 minutes, 52 seconds of material for review.  Accordingly, the FBI is able to reduce the previously estimated time needed to 15 months (15 interim releases on CD), to produce all non-exempt portions of the media and beginning after the FBI completes processing of the paper and photographic records.  The below paragraphs explain the rationale behind the FBI's policy of producing media in 15-minute increments, per requester, via interim monthly releases on CD.

## THE FBI'S INTERIM RELEASE POLICY

(7)     The rationale for the FBI's interim release policy is based on sound FOIA business practice.  FOIA encourages agencies to develop multi-track processing with the goal of responding to more requests.  Second, the policy promotes both RIDS and requester efficiencies. Moreover, maintaining a steady interim release posture is key in meeting the demands posed by the growing number, size, and complexity of FOIPA requests received by the FBI.  Third, part of the process in finalizing material for release involves information security.  All FOIPA requests containing law enforcement records and media are processed on a classified computer network. Thus, when a CD is prepared for release after review and consultation, it must also undergo a multi-step information security review.  Specifically, the FBI employs security software that must be utilized every time information is taken from the classified network and released to a

_____

[1] The FBI's letter also states, at the bottom of page 1, "[p]lease remember this is only an estimate, and some of the information may be withheld in full pursuant to FOIA/Privacy Act exemptions.  Also, some of the information may not be responsive to your subject.  Thus, the actual charges could be less."

requester in an unclassified format. This entails running a general security protocol, whereby the software scans for prescribed code words (for either paper or media records); and an individualized protocol, whereby the software scans for words that RIDS determines are unique to the particular request and may include searches for specific exempt words, names, confidential sources, or classified techniques. The running of these security protocols, and resolving any issues that may arise, can require a significant amount of effort and time.

(8)    All three of the above-mentioned factors work together to form the basis of the FBI's interim release policy, designed to most equitably provide the largest number of requesters the largest amount of information possible. Altering the FBI's interim release policy to provide more information faster or at a higher rate for requesters who litigate over those that do not creates an imbalance of RIDS' finite FOIPA processing resources. In this instance, because the Court Ordered rate of processing the paper and photographic records at a rate of 1,000 pages per month is already twice the rate at which the FBI typically processes paper and photographic records, processing at this higher rate means allowing one requester to consume a much larger amount of RIDS resources and ahead of other requesters who submitted their requests prior to Plaintiff. Without a compelling need to provide the media records in an expedited fashion, as defined by 5 U.S.C. §§ 522(6)(E)(v)(I) and (II), the FBI asserts that such expedited treatment of the portion of Plaintiff's request involving media would be unwarranted and further exacerbates the imbalance.

PROCESSING RATE FOR MEDIA

(9)    As noted in ¶ 4 *supra*, the records responsive to Plaintiff's request also includes responsive media (videos contained audio) for processing. The background and rationale for the FBI's interim release policy above also applies to media. Starting in FY2019, RIDS instituted a

policy of reviewing 15 minutes of video per month, on Compact Disk ("CD") or digital video

disc ("DVD"), per request.  As with non-media, this policy derives from, and is the FBI's effort

to comply with, DOJ FOIA regulations at 28 C.F.R. § 16.5(b) (regarding prompt disclosure of

responsive material upon payment of any applicable fees); adherence to this policy is key to

addressing the influx of FOIPA requests containing media.  The FBI applies a similar four-part

rationale justifying its processing rate for media.

(10)    First, this policy is based on sound FOIPA business practice.  The FOIA

encourages agencies to develop multi-track processing with the goal of responding to more

requests.  Accordingly, the FBI established four processing queues – small queue (1-50 pages),

medium queue (51-950 pages), large queue (951-8,000 pages), and extra-large queue (more than

8,000 pages).  Within each queue, requests are processed in "first in, first out" ("FIFO") order.

By making interim releases of pages (paper) in 500-reviewed pages increments, RIDS regularly

provides more pages to more requesters across the four queues, thus avoiding a system where a

few, large queue requests monopolize finite processing resources resulting in less pages provided

to fewer requesters on a more infrequent basis.  In addition to processing standard paper and

electronic records in increments of 500 pages, by processing smaller portions of media records in

interim releases, the FBI is able to provide more media records to more requesters, each month.

Processing media in this manner avoids a system where a few requests containing large amounts

of media monopolize RIDS' limited FOIPA media processing resources.

(11)    Second, the policy promotes processing efficiencies.  In contrast to the personnel

available when processing standard records requests, there are even fewer qualified RIDS

analysts who possess the requisite skills to process media records because processing media

records requires two separate, specialized skill sets.  First, as with non-media processing, the

FOIPA analysts processing media records must possess legal knowledge of the FOIA and Privacy Act in order to appropriately review media records for responsiveness and assert proper withholdings pursuant to the exemptions afforded to federal agencies by the FOIA and Privacy Act. Second, and differing from the requisite skills needed to process non-media, these individuals must be technologically trained and adept in addressing the multitudinous obstacles posed by processing FBI media records.[2]

(12)    Third, RIDS has limited workstations capable of processing media records. Currently, RIDS has two analysts assigned and dedicated to processing/reviewing FOIPA media records; a limited number of analysts from the Digital Conversion Unit ("DCU"), a separate IMD unit outside of RIDS, available to conduct file conversions; and a limited number of workstations capable of processing media records to enable RIDS' current media processors to review and process media records full time in FIFO order. Interim releases allow this limited number of highly skilled individuals to process FOIPA requests containing media in manageable, monthly pieces. This also enables RIDS to make more releases to more requesters each month – their goal is to process media in 10 to 15 different FOIPA requests each month, and processing media in manageable portions allows RIDS to meet this goal. Media records subject to the FOIPA often contain investigative sensitivities requiring expert review by FBI investigative personnel or other subject matter experts ("SMEs") outside of RIDS.

(13)    Fourth, as noted in ¶ 7 *supra*, part of the process of finalizing material for public release involves information security. As applied to records in media format, a CD/DVD containing digital media must also undergo a multi-step information security review to move

---

[2] The difficulties associated with media processing are discussed further *infra.*

information from the classified enclave to an unclassified, public release setting. Specifically, RIDS personnel must first purge the media records of all metadata present within the records. This metadata can contain sensitive information concerning the FBI's digital security measures and/or the personal identifying information of FBI staff. For video and audio records, this takes about half the time of the length of the digital media (7.5 minutes for 15 minutes of video and 15 minutes for 30 minutes of audio). Following this step, the media must undergo a final quality check by an expert FOIPA media reviewer. This quality check requires the FOIPA media expert to review the video and audio, through a real-time playback of the media.[3] The running of these security protocols, and resolving any issues that may arise, requires a significant amount of time and effort which only increases as more media is added to an interim production.

(14)    All four of the above factors work together to form the basis of the FBI's interim media release policy, designed to equitably provide the largest number of requesters the largest amount of information possible.

THE COMPLEXITIES ASSOCIATED WITH MEDIA PROCESSING

(15)    The rationale for processing media at a rate of 15 minutes of video or 30 minutes of audio is a result of certain complexities in the conversion and redaction process, which do not exist in non-media processing. The following describes how the FBI determined the ideal sizes of interim media productions for its FOIPA releases, including the complexities of converting media records into workable formats and the challenge associated with redacting media records.

---

[3] This review of the real-time playback often takes longer than the length of the actual audio/video. This is because the reviewers often must pause, rewind, and/or re-review the media as they endeavor to ensure no sensitive FBI equities are subject to release.

8

*Conversion*

(16)    One of the main complexities associated with the FBI FOIPA media processing is

the variance in the types of media located within FBI records.  The FBI's media records span the

existence of the FBI from 1908 to the present.  Media records created in furtherance of the FBI's

investigative efforts are recorded through the prevalent technologies available at the time of the

FBI investigations.  Older FBI investigative media records are usually in outdated, analog

formats, such as reel-to-reel audio and video.  This means IMD must 1) maintain expertise in

these old, analog media types, and 2) convert the analog media types to digital records prior to

RIDS being able to process them for release through use of the FBI's current media processing

technology.  Additionally, conversion from analog to digital formats is very time-consuming.

This is because these records must often be played back in real-time/close to real-time while a

digital recorder captures the images/audio in a workable digital format.

(17)    Though it would seem counterintuitive, the conversion of digital media records to

workable file types is often just as complex.  Through its investigations, FBI personnel often

obtain digital files from third party sources of varying file types.  The FOIPA media processing

software available to RIDS analysts works more efficiently when video records are converted to

mp4 files and audio files are converted to .wav files.  Converting other file types to these formats

requires the FBI maintain many different software licenses and is often a time-consuming

process.  Additionally, many video files are housed on digital video recorder ("DVR") devices

with proprietary digital storage software that do not have a built-in function for exporting the

video files off of the DVR.  Such digital recording devices only allow for playback of the video

they recorded.  For such devices, IMD analysts must pursue a conversion process akin to what

they use to convert analog video – they must play the video housed on such devices in real-

time/close to real-time while a digital recorder captures the video in a workable digital format.

(18)     The conversion efforts described above present a substantial limitation on the amount of media RIDS can process. FBI anticipates that conversion will be a significant issue in processing the videotapes in this case. IMD must complete all the above steps to get media records into a format where they can be efficiently processed for release under the FOIPA. Increasing the processing rates for Plaintiff's request would force IMD to pull more resources away from other projects involving document conversion in order to meet an increased FOIPA demand. This could potentially create a large backlog of records requiring conversion, greatly slowing down IMD's ability to respond to other FOIPA requests containing media and to serve other IMD initiatives. DCU's stated purpose is to manage, consolidate, and operate the conversion of digitally captured and "digitally born" files stored on various media types to requested file formats, to ease the accessibility and usability for both investigative and administrative purposes. They play a key role in helping the FBI manage information and records in the digital age. Forcing IMD/DCU to convert more FOIPA records monthly at the expense of its other customers, including FBI investigators, could endanger IMD's ability to meet its mission and hinder FBI investigators from effectively pursuing the FBI's core investigative mission.

*Redaction of Exempt Video Information*

(19)     Currently, four (4) responsive videos are at issue. Once the video media are converted to a digital format, RIDS' FOIPA media analysts then must review the material to determine if release of the media would present harms under FOIPA exemptions. If such harms are present, RIDS' media analysts must redact exempt material from the media.

(20)     With video files, RIDS' analysts must process the records frame-by-frame to

withhold sensitive information. This is because FBI video captures images of individuals and events in motion, and any redactions must be constantly adjusted, frame-by-frame, to follow the moving images depicting exempt information. Prior to applying any redactions, RIDS media analysts must first study the video and all the actions taking place to determine the identities of the various individuals captured in the video and any other sensitivities present. They then must determine what they are lawfully allowed to withhold from the video under one or more FOIPA exemptions. After this analysis is complete (which often requires multiple viewings of the video), RIDS media processors then begin the arduous process of applying redactions to the video. As an example of how laborious this is, consider the process for withholding individuals' personal privacy information pursuant to Exemptions (b)(6) and (b)(7)(C). If when viewing a video, a RIDS analyst determines an individual maintains a privacy interest in not having his or her identity disclosed in the context of FBI investigative records, and release of his or her identity would constitute an unwarranted invasion of privacy, the analyst must redact the video in a manner that conceals the individual's identity. This often requires applying a redaction over the individual's face. As the individual moves within the video, RIDS analysts must apply a redaction concealing the individual's face that follows his or her movements, frame-by-frame. In many instances, FBI video captures the actions of *multiple* individuals who maintain privacy interests in not being disclosed within FBI records. Thus, RIDS analysts must repeat the process of redacting faces (or other identifying information including, but not limited to, license plates or address numbers), frame-by-frame, for all such individuals.

(21)    It is also important to note that video records often also have an audio component. This means that when reviewing video, RIDS analysts must also review and excise any audio through the process described below. Here, the RIDS analysts must process almost four hours of

11

video, the equivalent of approximately 15 monthly releases.

(22)    *Audio:*  Audio also presents its own complexities.  Typically, the FBI's audio records capture dialogue between individuals.  Often, it is not readily apparent to RIDS analysts reviewing such audio files who is speaking.  This is because there is often no video or visual record accompanying the audio to give context.  The FBI investigators often only provide brief descriptions of the participants.  Additionally, the audio is often not completely clear, and RIDS analysts must listen to the audio several times to discern the nature of what is being discussed. As with video files, RIDS analysts must study the audio first to determine the identities of the various individuals speaking in the audio and review for other sensitivities present.  RIDS analysts must research the identities of participants and decipher the context of the recorded conversation.  Analysts then must conduct a legal analysis to determine what they are lawfully allowed to withhold from the audio under one or more FOIPA exemptions.  Once they establish what is exempt within the audio files, they must excise the audio in segments where sensitivities are present.[4]  To complete a proper review, RIDS analysts must often replay the audio numerous times in order to ensure they have properly applied all appropriate FOIPA exemptions.  Here, RIDS must process over 6 minutes of audio, the equivalent of one release.

THE FBI'S CURRENT MEDIA PROCESSING RATES

(23)    To establish media processing rates, and similar to how RIDS calculated processing rates for non-media, RIDS conducted time studies to discover the typical amount of time it takes to apply redactions and prepare media files for public release.  Through this study,

---

[4] In rare instances, RIDS also has the option to employ software that alters individuals' voices to conceal their identities.

RIDS found 15 minutes of video typically requires approximately 11 hours of processing time. RIDS found processing 30 minutes of audio typically requires about the same amount of time, approximately 11 hours. Additionally, RIDS found 15 minutes of video and 30 minutes of audio presented ideal sizes for quality assurance reviews and reviews by external SMEs, as described *supra*. Keeping media at this size allows RIDS media analysts to meet their goal of providing media for approximately 10-15 different requests each month (this includes audio, video, and high-quality photographs). Thus, RIDS determined these established processing sizes allow it to equitably distribute its finite media processing resources to provide the most records to the highest number of requesters each month.

(24)    Furthermore, the FBI does not have the additional resources necessary to produce more media records overall. Shifting more RIDS personnel to media processing would require RIDS to pull from the cadre of RIDS analysts already fully engaged in standard processing of pages. Shifting additional personnel has its limits due to the training necessary to process media. As previously detailed, *supra* ¶ 12, RIDS has only two analysts assigned and dedicated to processing/reviewing FOIPA media records; a limited number of analysts from the Digital Conversion Unit ("DCU"), a separate IMD unit outside of RIDS, available to conduct file conversions; and a limited number of workstations capable of processing media records to enable RIDS' current media processors to review and process media records full time in FIFO order. The equipment required for media processing is highly specialized and expensive. The formats of FBI media records greatly vary and RIDS/IMD must have the equipment and software to review and process all of these media types. Additional space and resources to acquire and accommodate more equipment and software for additional media processing are not currently available to RIDS/IMD.

**CONCLUSION**

(25)     The FBI takes very seriously its responsibilities with regard to the administration

of the FOIPA program.  All reasonable efforts are being made to timely process requests at the

administrative stage and those in litigation, including Plaintiff's. The FBI has carefully balanced

the volume of responsive records along with Plaintiff's interests, while also recognizing and

preserving the rights of other litigants and requesters in accessing information they seek.  Due to

the volume of work generally faced by RIDS, with respect to administrative matters and other

litigation cases, in conjunction with the FBI's processing policy and the time needed to process

videos responsive to Plaintiff's request, the FBI is requesting a production rate of approximately

15-months (15 interim releases) to produce the videos in approximately 15-minute increments

per CD, after processing of the paper and photographic records is complete.  The requested

production rate falls in line with the FBI's policy and will allow RIDS the time necessary to

process and release all non-exempt records responsive to Plaintiff's request.  Further, the FBI

determined that altering its policy to suit the personal preferences of Plaintiff, or any of the

thousands of other requesters seeking information from the FBI, would not be feasible or

efficient and would disrupt RIDS's ability to process the high volume of requests that are

received in a manner that is most beneficial for FOIPA requesters as a whole.  Accordingly, the

FBI respectfully requests that this Court adopt its proposed processing schedule with regard to

the video records potentially responsive to Plaintiff's request.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and Exhibit A attached hereto is a true and correct copy.

Executed this 26th day of April 2022.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia