UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FINDERS KEEPERS USA LLC,           ) | |
|                                    ) | |
|           Plaintiff,               ) | |
|                                    ) | |
|     v.                             ) | Civil Action No. 22-0009 (APM) |
|                                    ) | |
| U.S. DEPARTMENT OF JUSTICE,        ) | |
|                                    ) | |
|           Defendant.               ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDNT'S MOTION
FOR A VIDEO PROCESSING SCHEDULE**

**INTRODUCTION**

From the outset deception and misrepresentations have marked Plaintiff's dealings with the U.S. Department of Justice ("DOJ"), and the treatment of Plaintiff's Freedom of Information Act ("FOIA") request by the Federal Bureau of Investigation ("FBI") is no exception. The latest chapter in this regrettable story concerns videotapes the FBI created that document its excavation for gold in Dents Run, Pennsylvania. Contrary to all the evidence of record, the FBI has insisted it found no gold; those tapes would confirm or disprove the FBI's claim. Now with its motion for a video processing schedule the FBI asks this Court to accept uncritically its claim to need 15 months to process four videotapes the FBI claims are all that exist from its activities at Dents Run.

According to the FBI, "sound business practice" and "efficiencies" dictate that the agency process only 15 minutes of videotape per month notwithstanding that Plaintiff filed the FOIA request at issue four years ago and has requested expedition based on its showing that the request involves a matter of widespread and exceptional media interest in which there exist

possible questions about the government's integrity that affect public confidence. Allowing the FBI to process only 15 minutes of videotapes per month would contravene the clear public interest in access to information reflecting directly on the integrity of the FBI. Even more troubling, the FBI insists, contrary to the plain language meaning of its previous statements, that it has located only four responsive videotapes. This claim, when coupled with the FBI's previous treatment of Plaintiff's FOIA request, calls into question the agency's good faith in processing Plaintiff's request and raises a serious question of how many responsive videotapes in fact exist and if some are missing, why.

## FACTUAL BACKGROUND

The factual background to the Plaintiff's FOIA request provides the context for understanding just how troubling the FBI's treatment of that request is. Plaintiff Finders Keepers is co-owned by Dennis and Kem Parada, a father and son team of treasure hunters who for many years have searched for Civil War-era gold rumored to be buried in Elk County, Pennsylvania. Complaint ("Compl.") ¶ 14. According to folklore—as well as newspaper and magazine articles dating back to the 1960s and 1970s—a shipment of gold transported by Union soldiers on their way to the U.S. Mint in Philadelphia was stolen and buried somewhere in the hills of Elk County. *Id.*

Armed with metal-detecting instruments, the Paradas began exploring an area known as Dents Run starting in 2004. Compl. ¶ 18. The Dents Run site is on forest land owned by the Commonwealth of Pennsylvania. *Id.* ¶ 19. Using a variety of metal detecting instruments the Paradas detected a large cache of metal in an underground chambered cave. *Id.* ¶ 18. The "resistivity" readings they obtained over a three-year period suggested the highly-conductive metal was gold. *Id.* In addition, while drilling a small inspection borehole at the site, what

appeared to be specks a gold colored material were found on a drill bit that had gotten stuck, although the material was too small to test. *Id.*

On January 26, 2018, the Paradas and investigative journalist Warren Getler met with two FBI agents from the FBI's Art Crime Team and an Assistant United States Attorney at the U.S. Attorney's Office in Philadelphia. Compl. ¶ 20. The Paradas and Mr. Getler requested the meeting to inform the U.S. government about their detection of a large amount of metal in an underground cave in the Dents Run area that their metal-detecting instruments suggested was gold and that they believed belonged to the United States. *Id.* At that meeting Mr. Getler explained the immense historical significance should the cache of gold be recovered and the likely high monetary value of what was estimated to be 12 cubic feet of gold. *Id.* ¶ 21. Both the Paradas and Mr. Getler stated their expectation to be allowed to witness any dig to fully account for the amount, weight, condition, purity, and provenance of any Civil War-era gold the FBI recovered. *Id.*

On January 31, 2018, at the FBI's request the Paradas and Mr. Getler met seven FBI agents at the Dents Run site, where they obtained a resistivity reading strongly suggestive of gold. Compl. ¶ 23. The FBI followed up with another onsite survey conducted on February 26, 2018 by Enviroscan (now Rettew Associates), a well-recognized and highly respected geophysical engineering company, using a highly sensitive detection device called a gravimeter. *Id.* ¶¶ 25, 26. In the first week of March 2018, the FBI special agent in charge notified Mr. Getler and Dennis Parada that the results from the gravimeter scan were positive for gold and indicated the metal target it had detected was about seven to nine tons in mass with a density value of 18-19 (consistent with gold). *Id.* ¶ 27.

On March 9, 2018, FBI Special Agent Jacob B. Archer filed an application for a warrant

to seize property subject to forfeiture in the U.S. District Court for the Eastern District of Pennsylvania, *In the Matter of the Seizure of One or More Tons of United States Gold*, Case No. 18-361-M (E.D. Pa.) ("Seizure Application") (Exhibit A to Compl.). Compl. ¶ 28. The Seizure Application described the property to be seized as "[a]pproximately one or more tons of gold belonging to, and stolen from, the United States Mint, and located in the Dents Run Site, in Elks County, Pennsylvania." *Id.* In the application Special Agent Archer also delineated six factors that gave him probable cause that the buried gold was stolen from and belongs to the United States. Compl. ¶ 34. They include: (1) results of Enviroscan's microgravity survey; (2) information from the U.S. Mint that during the Civil War only the U.S. Mint possessed large amounts of purified gold; (3) information from the U.S. Mint that it was the only entity purifying large quantities of gold during the Civil War; (4) information from the American Numismatics Society and his own research that there were no large-scale private mint producers during the Civil War; (5) National Archives records indicating that the U.S. Mint in San Francisco produced significant amounts of troy ounces of gold for the year ending in 1863; and (5) bills of lading indicating the shipments of gold via ship and land passage between the U.S. Mint in San Francisco and the U.S. Mint in Philadelphia. *Id.*

On March 9, 2018, U.S. Magistrate Judge Richard S. Lloret granted the FBI's application for a warrant to seize the Dents Run gold. Compl. ¶ 36. The warrant gave the FBI up to 30 days to execute the warrant and directed the FBI to do so "in the daytime 6:00 a.m. to 10:00 p.m." *Id.*

The FBI began the excavation of the Dents Run site on March 13, 2018. Compl. ¶ 38. The Paradas and Mr. Getler, who were present but not allowed at the actual excavation site, observed as many as 25 FBI vehicles parked along the road. *Id.* ¶ 38. They were directed to remain in their car, where they sat for the next six hours. *Id.* Finally, at 2:00 p.m. they were

escorted up the hill where they observed a large assembly of approximately 30 FBI agents including a photographer/videographer. *Id.* Then at approximately 3:00 p.m. the agent in charge declared the dig over for the day, even though it was not yet dark. *Id.* At that point the FBI had dug six feet down; the target gold was believed to be located approximately 10 to 12 feet below the surface. *Id.*

The Paradas and Mr. Getler returned to the site the following morning at 8:15 a.m. where once again the FBI directed them to remain in their car. Compl. ¶ 39. The agent in charge advised them that renewed excavation would be delayed due to water accumulation in the pit. *Id.* At 1:30 p.m. he led the Paradas and Mr. Getler to the top of the hill where they observed 30 or more FBI agents standing near a deep, fully excavated hole at a depth of approximately 13 feet. *Id.* The FBI agent in charge noted that nothing was in the hole but refused to answer Dennis Parada's question as to whether the FBI had found any gold. *Id.* Upon leaving the site at 3:30 they were directed by the agent in charge to not speak a word about the dig to anyone "or there will be serious repercussions." *Id.*

A few days after the FBI completed its dig at Dents Run, an off-duty Pennsylvania police officer told the Paradas and Mr. Getler that he had witnessed two "Brinks" type armored trucks supported by two Humvees and a black SUV with satellite communication antennae driving from the Dents Run area past the nearby town of Weedville at approximately 10:00 a.m. on March 14, 2018. Compl. ¶ 43. Another resident of Weedville subsequently provided a similar account to the three, adding that the satellite truck had the marking "FBI" on it and that the armored vehicles had the words "FBI Police" on them and appeared to be like a Lenco BearCat model, which is capable of transporting more than two tons of weight. *Id.* She also described seeing three white SUVs marked as FBI Police heading later that day to Dents Run at around

5:00 p.m. *Id.* Other area residents described seeing a variety of vehicles, including an armored vehicle, and one eyewitness described the roads leading in and out of Dents Run as barricaded by FBI Police on the evening of March 13, 2018—hours after the FBI told the Paradas and Mr. Getler the dig was finished for the day—and again around 6:00 p.m. on March 14, 2018. *Id.* On the evening of the 14th the FBI required that local residents stay in their homes. *Id.*

In a videotaped interview with the *Associated Press* on September 20, 2018, Cheryl Elder, whose home lies close to the Dents Run site, described loud and disruptive excavation activity by heavy equipment on the evening of March 13, 2018, starting at around 8:30 p.m. Compl. ¶ 44. The activity was still ongoing when she fell asleep at about 2:00 a.m.—long after the 10:00 p.m. deadline imposed by Magistrate Judge Lloret. *Id.* Ms. Elder also described black unmarked SUVs and trucks moving back and forth in the Dents Run area that evening, and various six-wheel All Terrain Vehicles coming down the slope to meet them. *Id.*

Although the FBI has yet to provide the Plaintiff with a single document, the Paradas have their own trail cam photographs taken of at least some of the FBI's dig at Dents Run, one of which is attached as Exhibit A. That trail cam photograph shows, among other things, an individual with the FBI videotaping the excavation. Because no one from the press was allowed to witness the dig, *see* Declaration of Warren Getler at ¶ 9 (attached as Exhibit B) ("Getler Decl."), the FBI apparently has the only videotapes memorializing what the FBI discovered at the Dents Run site.

## PROCEDURAL HISTORY

Plaintiff filed the FOIA request at issue four years ago on May 8, 2018, for documents that would confirm the truth or falsity of the FBI's insistence that its excavation in March 2018 in Dents Run, Pennsylvania uncovered nothing despite the wealth of scientific and historical

evidence suggesting the presence of Civil War-era gold. *See* Compl. ¶ 45. Weeks later by letter dated May 23, 2018, the FBI advised Plaintiff that it had no responsive documents in its Central Records System, *id.* ¶ 46, despite the known existence of the records created by Enviroscan and the large operation the FBI conducted at Dents Run in March 2018. After Senator Pat Toomey intervened in the matter the request was remanded to the FBI to conduct a further search. *Id.* ¶ 47.

On remand the FBI came up with a new justification for its refusal to produce any documents: that the responsive documents are law enforcement records and their release would interfere with enforcement proceedings. *Id.* ¶ 48. Plaintiff administratively appealed that claim, explaining that given that the theft of the gold at issue occurred over 100 years ago, it is difficult to believe there is an ongoing investigation of the circumstances related to that crime. *Id.* ¶ 49. The appeal was granted and once again the matter was remanded to the FBI for further processing of the requested records. *Id.* ¶ 50.

On remand the FBI in an August 6, 2019 letter (Exhibit A to Memorandum of Points and Authorities in Support of Defendant's Motion for a Videotape Processing Schedule (Dkt. 17-3) ("D's Ex. A to D's Mem.")) advised plaintiff that it had located approximately 2,378 pages of responsive records. The FBI further advised Plaintiff:

> The FBI located video files that are potentially responsive to the subject of your request. If all of the potentially-responsive media is released, you will owe $255.00 (*17 CDs at $15.00 each*).

*Id.* (emphasis added). Plaintiff's then-counsel responded by letter dated August 8, 2019, indicating Plaintiff's "willingness to pay estimated duplication fees up to the amount specified in your letter, namely $70.00 for pages on CD *and $255.00 for video files on 17 CD*s. *See* Letter of August 8, 2019, from William J. Cluck to FBI Work Process Unit (attached as Exhibit C)

(emphasis added).

By letter dated March 10, 2021, Plaintiff requested from DOJ's director of Public Affairs that DOJ expedite its request. Compl. ¶ 55. As Plaintiff explained, its request now involves a matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity that affect public confidence, citing in support four recent news articles. *Id.*[1] Plaintiff further explained that the news coverage and Plaintiff's own investigation revealed significant questions about the FBI's integrity, noting that the FBI had spent considerable tax dollars on the gold recovery venture. *Id*. By form letter dated April 5, 2021, the FBI advised Plaintiff that its request for expedition was denied. The FBI's explanation for the denial stated in full: "You have not provided enough information concerning the statutory requirements for expedition; therefore, your request is denied." Letter of April 5, 2021, from Michael G. Seidel, FBI Section Chief to William Cluck (attached as Exhibit D).

By January 4, 2022, when Plaintiff filed its complaint in this action (Dkt. No. 1), the FBI had yet to produce a single responsive document to Plaintiff or claim any exemption. Nor had the FBI advised Plaintiff that its understanding that the FBI had 17 potentially responsive CDs,

---

[1] Those cited articles can be found at https://www.pennlive.com/news/2021/01/did-the-fbi-find-400m-in-civil-war-gold-in-a-pa-forest-harrisburg-lawyer-says-he-has-new-clue-in-the-case.html; https://www.foxnews.com/us/civil-war-gold-treasure-hunters-lawyer-say-fbi-acting-suspicious-in-wake-of-dig-at-pennsylvania-site; https://www.pennlive.com/news/2019/10/did-the-fbi-find-a-fabled-cache-of-lost-civil-war-gold-pa-court-order-might-help-treasure-hunters-find-out.html; https://www.washingtonpost.com/business/technology/emails-fbi-was-looking-for-gold-at-pennsylvania-dig-site/2021/03/08/96ae38f4-8056-11eb-be22-32d331d87530_story.html. The number of news articles concerning the FBI's dig for gold at Dents Run has grown exponentially since that date, as have the questions concerning the FBI's conduct. *See*, *e.g.*, https://www.popularmechanics.com/adventure/a39493418/treasure-hunters-gold-fbi/; https://www.washingtonpost.com/history/2021/06/28/fbi-civil-war-gold/; https://www.bloomberg.com/news/articles/2021-06-25/fbi-hunt-for-lost-civil-war-gold-detailed-in-unsealed-affidavit; https://www.nbcnew.com/news/us-news/fbi-feared-pennsylvania-would-seize-fabled-gold-court-docs-show-n1272322.

containing the video files, as expressed in Plaintiff's August 18, 2019 letter (P's Ex. C), was inaccurate in any respect. In fact, in its Answer (Dkt. No. 10), DOJ admitted without qualification "that a letter was sent to Plaintiff on August 6, 2019, notifying Plaintiff *that FBI had located* 2378 pages of records *and 17 video files* responsive to Plaintiff's request." Answer ¶ 51 (emphasis added).

In a March 8, 2022 Order this Court directed the parties to file a Joint Status Report by March 18, 2022, that addressed, among other things, "(1) the status of Plaintiff's FOIA request [and] (2) the anticipated number of documents responsive to Plaintiff's FOIA request].]" In response the FBI claimed for the first time that it had only "four (4) videos totaling approximately 3 hours, 46 minutes, 52 seconds[.]" Joint Status Report at ¶ 4(a) (Dkt. No. 12). When pressed by Plaintiff's counsel DOJ was unable to explain why the FBI's number of responsive video records had changed from 17 videotapes—the number it acknowledged as correct in its Answer filed several weeks earlier—to only four videotapes of the two-day dig totaling less than four hours. *See* Plaintiff's Motion for a Processing Order and Supporting Memorandum at 2 (Dkt. No. 13).

Defendant has now filed a motion for a video processing schedule that would allow the FBI to process the videotapes at a rate of 15 minutes per month for a total of 15 months based on the FBI's latest claim that it has only four videotapes. To explain the significant discrepancy between the number of responsive videotapes the FBI initially claimed to have (17) and its latest claim to possess only four the FBI now offers the convoluted explanation that what it meant by its representation that it had 17 video files was in fact an "estimate[] that the video would likely be produced in 17 monthly productions of one CD per month." D's Mem. at 3 n.1.

9

## ARGUMENT

### I. The FBI Has Failed To Justify Its Request For 15 Months To Process The Four Videotapes It Claims To Possess.

To justify its universally applied policy of processing video records at a rate of 15 minutes per month, the FBI relies on "sound business practice," "efficiencies," purported "technical limitations," and a need to maintain "public information security[.]" D's Mem. at 4; Declaration of Michael G. Seidel at ¶ 9 ("Seidel Decl.") (Dkt. No. 17-2). The FBI's declarant has described the bases for this policy in broad generalities, ignoring the age of the request at issue and the significant public interest in prompt disclosure of the best evidence concerning the integrity of the FBI. The FBI also has overstated the technical challenges posed by processing the requested videotapes, which the FBI created using FBI equipment. *See* Getler Decl. ¶ 7. Taken as a whole, these factors compel a production schedule that significantly exceeds processing a mere 15 minutes of videotape per month.

At its core, the FBI's proposed video processing schedule rests on the belief that no matter the circumstances, the FBI should be permitted to follow its business-as-usual "interim release policy." Seidel Decl. ¶ 9. The FBI first justifies that policy as a "sound FOIA business practice" that consists of its multi-track processing schedule and practice of processing records "in increments of 500 pages," D's Mem. at 2; Seidel Decl. ¶ 10. But this ignores that for all but the videotapes the Court already has imposed a processing schedule of 1,000 pages per month as Plaintiff requested with no objection from the Department of Justice. *See* Order, Apr. 18, 2022 (Dkt. No. 15). The time for justifying an alternative document processing schedule as a "sound FOIA business practice" has long passed.

It also ignores that Plaintiff sought expedition because its request involves a matter of widespread and exceptional media interest in which possible questions exist about the

10

government's integrity that affect public confidence. While the FBI claims no compelling need exists here to expedite processing of the videotapes, Seidel Decl. ¶ 8, that is a claim in this litigation that has yet to be resolved. *See* Compl., Claim Two, ¶¶ 63-67.

Moreover, DOJ has provided no detail about where in its multi-track processing Plaintiff's FOIA request stands, how many pending requests filed before Plaintiff's remain in the queue, how the size and complexity of Plaintiff's request compares to other pending requests, or even how many other requests for videotapes the FBI faces. These are precisely the kind of details that courts have recognized as necessary to justify an *Open America* stay. *See Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 616 (D.C. Cir. 1976) (mere existence of a backlog insufficient). Indeed, Congress amended the FOIA to make clear that the mere existence of a backlog does not constitute "exceptional circumstances." *See* 5 U.S.C. § 552(a)(6)(C)(ii) and H.R. Rep. No. 104-795, at 24-25 (1996) (specifying factors that agency should consider as including "agency's efforts to reduce the number of requests"; "the amount of material classified;" "the size and complexity of other requests processed"; "the resources being devoted to the declassification of classified material" and "the number of requests for records by courts or administrative tribunals." Without these essential facts the FBI's generic description of its business practice fails to justify the lengthy processing schedule it seeks here.[2]

Second, the FBI justifies its policy as promoting "processing efficiencies" given the purportedly "specialized skill sets" processing media records requires, Seidel Decl. ¶ 11, and considering the agency's "technical limitations." D's Mem. at 4. Those special skills include knowledge of the FOIA—a skill required of every agency official involved in processing FOIA

---

[2] Although DOJ has denied the need for an *Open America* stay, Joint Status Report, Mar. 28, 2021, ¶ 4(d) (Dkt. No. 12), it seeks the equivalent of one with it request for a 15-month reprieve to process the videotapes. Accordingly, the standards for granting an *Open America* stay have particular relevance here.

requests—and the technological ability to deal with "the multitudinous obstacles" processing FBI media records purportedly imposes. *Id.* Here, too, the FBI has drastically overstated the barriers to processing videotapes and provided few specifics to properly evaluate the burden imposed by the specific request at issue.

The FBI touts itself as "one of the world's premier security and crime-fighting forces," and its website describes the vast array of sophisticated technology it employs towards that end. *See* https://www.fbi.gov/about. Yet it asks this Court to accept uncritically its claim that processing the videotapes at issue presents a vastly complex challenge that only a few "technologically trained" individuals can meet. *See* Seidel Decl. ¶ 11. The process it describes for meeting that challenge, however, is hypothetical and fails to consider the facts here.

The videotapes Plaintiff seeks were created by the FBI itself in 2018. *See* Getler Decl. ¶ 7. Thus, the FBI's discussion of the challenges posed by processing "outdated, analog formats," Seidel Decl. ¶ 16, and digital files obtained "from third party sources," *id.* ¶ 17, has no relevance here. Yet the FBI insists—with no supporting evidence—that converting the videotapes at issue will be "a significant issue" because the agency must complete *all* the processing steps it has delineated. *Id.* ¶ 18. Given the source and age of the tapes that claim is patently false.

Moreover, the FBI justifies the time required to process the videotapes as due in significant part to the fact that it has "only two analysts assigned and dedicated to processing/reviewing FOIA . . . media records[.]" D's Mem. a 4; Seidel Decl. ¶ 24. It also claims to have "*a limited* number of analysts from the Digital Conversion Unit," and a "*limited number of workstations*" to process media records, *id.* (emphasis added) but offers no specifics on what those actual numbers are. That the FBI made a personnel decision to limit the number of analysts available to process media records for FOIA requests, standing alone, cannot justify the

significant processing delays that personnel decision causes.

Beyond providing exact numbers of available personnel the FBI has not, for example, described unsuccessful efforts to obtain more personnel, how the current number of analysts compares to previous staffing, and the extent to which that staffing has changed with increased demand. Instead, it relies only on the training that would be needed if additional personnel were shifted to media processing. Seidel Decl. ¶ 24. Again, *Open America* provides a useful framework for evaluating this claim, with its requirement that an agency show efforts it has taken to alleviate a backlog claimed to be due to resource scarcity. *See, e.g., Clemente v. FBI*, 71 F. Supp. 3d 262, 266-67 (D.D.C. 2014) (failure of agency to demonstrate "reasonable progress in reducing its backlog" undermined agency's claim of exceptional circumstances). Stated differently, the FBI's "business as usual" approach does not meet its burden of justifying the 15-month delay it seeks here.

Finally, the FBI justifies its self-imposed policy—which it adopted sometime in FY 2019 (Seidel Decl. ¶ 9) *after* Plaintiff's request was remanded for the second time—as necessary to "ensure[] that public information security is appropriately maintained." D's Mem. at 4. Again, however, it describes the steps it must take in generalities, without tying them to the task at hand. For example, the FBI describes certain "security protocols" the FBI must electronically implement but offers no explanation of why this requires "a significant amount of time and effort" or even what constitutes "a significant amount." Seidel Decl. ¶ 13.

In sum, the FBI's supporting declaration lacks critical details, relying instead on vague references to limited resources and a desire to process Plaintiff's request in accord with a self-imposed policy that fails to consider the facts here, the age of Plaintiff's request, and the compelling public interest in the requested information. For all these reasons, Defendant has

13

failed to justify why it needs 15 months to process what it claims is less than four hours of videotapes.

### II. The FBI's "Clarification" Of The Number Of Responsive Videos It Possesses Contravenes The Plain Language Of Its Previous Explanation And Raises A Question About Its Veracity.

In a previous ruling this Court declined to compel the FBI to explain why its initial estimate of 17 responsive videotapes differs from its more recent estimate of four responsive videotapes because the FOIA does not require an agency to answer questions. Order of April 18, 2022 (Dkt. No. 15). With its motion for a video processing schedule, however, the FBI has put this question directly at issue. According to the FBI, the "intent" of the language it used in its August 6, 2019 letter (Ex. A to D's Mem.) was to communicate that "the FBI estimated that the video would likely be produced in 17 monthly productions of one CD per month." D's Mem. at 3 n.1. The problem for the FBI is that its letter did not say that.

In its August 6 letter the FBI stated as follows:

> The FBI located video files that are potentially responsive to the subject of your request. If all of the potentially-responsive media is released, you will owe $255.00 (*17 CDs at $15.00 each*).

The clear purpose of this letter was to inform the Plaintiff of the volume of responsive records it possessed, which included approximately 2,378 pages and, for the video files, 17 CDs. The letter lacked any language indicating the FBI intended to make 17 monthly productions of one CD per month. In fact, the letter made no reference whatsoever to any processing timetable.

While the interchangeable use of video files and CDs may have created some confusion, the Complaint filed in this case stated expressly that "[b]y letter dated August 6, 2019, the FBI notified Plaintiff that it had located approximately 2,378 pages of records *and 17 video files* potentially responsive to Plaintiff's FOIA request. The FBI estimated the cost of processing as

approximately $325 for CD release[.]" Compl. ¶ 51 (emphasis added). In its Answer DOJ admitted without qualification that "a letter was sent to Plaintiff on August 6, 2019, notifying Plaintiff that FBI had located 2378 pages of records and *17 video files* responsive to Plaintiff's request." Answer ¶ 51 (Dkt. No. 10) (emphasis added). Of note, this this was one of the few facts in the Complaint that Defendant admitted. For the vast majority of stated facts DOJ claimed to lack knowledge, including as to facts that it included in the warrant application filed to obtain permission to excavate the gold at Dents Run. *See, e.g.*, Complaint ¶ 19 (asserting that "[t]he Dents Run site is on forest land owned by the Commonwealth of Pennsylvania"), Answer ¶ 19 (asserting a lack of "knowledge or information sufficient to form a belief as to the truth of the allegations"), and Exhibit A to Complaint ¶ 29 (explaining why Defendant could not seek prior consent from the Commonwealth of Pennsylvania).

When given the opportunity to clear up any confusion during subsequent discussions concerning the Court-required Joint Status Report, the FBI declined to do so. *See* Plaintiff's Motion for a Processing Order and Supporting Memorandum at 2 (Dkt. No. 13). Only now does the FBI's declarant insist that "the intent of the language in the FBI's letter was to inform Plaintiff that with regard to production cost estimates for media, it could take up to 17 CDs to produce the videos." Seidel Decl. ¶ 5. Notably Mr. Seidel did not author the August 6, 2019 letter, which was written by David Hardy. Moreover, Mr. Seidel's declaration provides no details about the sources of his "aware[ness] of the FBI's handling of Plaintiff's FOIA request[.]" *Id.* at 3. Clearly, then, Mr. Seidel has not demonstrated that he is a competent witness to testify to the "intent" of the individual who authored the August 6, 2019 letter.

Further, the FBI has not provided the kind of details that would enable the Court to properly evaluate its claim that transferring the four hours of videotapes to CD format would

consume 17 CDs. Yet that information is crucial in evaluating the FBI's latest justification for why 17 videotapes has now shrunk to four.

Taken as a whole, the FBI's conduct raises a substantial question about whether the agency is acting in good faith.[3] Time and again the agency has pushed back against disclosing any record that would confirm or deny the existence of gold at Dents Run. As a result of the agency's dilatory conduct Plaintiff has yet to receive a single document responsive to its now four-year-old request. The videotapes likely represent the best evidence on this issue, yet the FBI asks this Court to bless a timetable that would allow it to stall production of the most revealing evidence for up to 15 months. And the justification for that timetable—which raises more questions than it purports to answer—rests on generalizations and lacks details sufficient to answer the question of just how many responsive videotapes exist.

This Court already has established a document processing schedule that will result in document production within three months. The Court should include the videotapes in that same schedule by requiring they also be processed within three months. This schedule will ensure public access to critical information that will answer questions going directly to the FBI's integrity, including whether the FBI has been truthful in its claim to have found nothing at Dents Run and whether the FBI violated the warrant by conducting the excavation after 10:00 p.m. Moreover, given that separate FBI staff is responsible for processing videotapes, Seidel Decl. ¶ 12, concurrent processing of both videotapes and other paper and digital documents will not interfere with the Court-imposed schedule already in effect.

---

[3] Targeted discovery presents the most expedient way to resolve the questions surrounding the number of responsive videotapes the FBI possesses and the agency's good faith in processing Plaintiff's request. *See*, *e.g. Long v. U.S. Dep't of Justice*, 10 F. Supp. 2d 205, 210 (N.D.N.Y. 1998) (plaintiff granted discovery where government relied on "boilerplate language" to justify search and claimed exemptions and the agency's good faith was at issue based on the adequacy of its search).

**CONCLUSION**

For the foregoing reasons, Defendant's motion should be denied, and the Court should include the videotapes in the existing document schedule by requiring they be processed within three months.

Respectfully submitted,

*/s/ Anne L. Weismann*
Anne L. Weismann
(D.C. Bar No. 298190)
5335 Wisconsin Avenue, N.W., Suite 640
Washington, D.C. 20015
Phone: 301-717-6610
Weismann.anne@gmail.com

Dated: May 9, 2022                             *Attorney for Plaintiff*