UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FINDERS KEEPERS USA LLC,

       Plaintiff,

     v.

DEPARTMENT OF JUSTICE,

       Defendant.

Civil Action No. 22-0009 (APM)

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ....................................................................................................................1

LEGAL STANDARDS FOR SUMMARY JUDGMENT ......................................................3

ARGUMENT ..........................................................................................................................6

I.   The FBI Conducted Adequate Searches for Potentially Responsive Records. ..........................7

II.   The FBI Appropriately Withheld Deliberative Process Material Pursuant to Exemption 5. ...10

III.  The FBI Appropriately Withheld Names and Other Identifying Information Pursuant to Exemptions 6 and 7(C)...................................................................................................15

IV.  The FBI Properly Withheld Information Pursuant to FOIA Exemption 7(E). ......................20

V.   The FBI Reasonably Segregated Non-Exempt Information. ................................................24

CONCLUSION.......................................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................3
*Campbell v. Dep't of Just.*,
164 F.3d 20 (D.C. Cir. 1998).....................................................................4
*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................3
*Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
600 F. Supp. 114 (D.D.C. 1984) ...............................................................5
*CIA v. Sims*,
471 U.S. 159 (1985) ................................................................................3
*Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Lab.*,
478 F. Supp. 2d 77 (D.D.C. 2007) ............................................................6
*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) ...................................................................................3
*Gallant v. NLRB*,
26 F.3d 168 (D.C. Cir. 1994) ...................................................................6
*John Doe Agency v. John Doe Corp.*,
493 U.S. 146 (1989) ................................................................................3
*Larson v. Dep't of State*,
565 F.3d 857 (D.C. Cir. 2009) ..................................................................6
*Machado Amadis v. Dep't of State*,
971 F.3d 364 (D.C. Cir. 2020) ..................................................................4
*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
566 F.2d 242 (D.C. Cir. 1977) ..................................................................5
*Media Rsch. Ctr. v. Dep't of Just.*,
818 F. Supp. 2d 131 (D.D.C. 2011) ...........................................................6
*Military Audit Project v. Casey*,
656 F.2d 724 (D.C. Cir. 1981) ..................................................................6
*Nat'l Treas. Emps, Union v. U.S. Customs Serv.*,
802 F.2d 525 (D.C. Cir. 1986) ..................................................................5
*Natural Res. Defense Council, Inc. v. Nuclear Regulatory Comm'n*,
216 F.3d 1180 (D.C. Cir. 2000)..................................................................5
*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) ................................................................................5
*Perry v. Block*,
684 F.2d 121 (D.C. Cir. 1982) ..................................................................4
*Reliant Energy Power Generation, Inc. v. Fed. Energy Regulatory Comm'n*,
520 F. Supp. 2d 194 (D.D.C. 2007) ...........................................................5
*Reps. Comm. for Freedom of the Press v. FBI*,
877 F.3d 399 (D.C. Cir. 2017)..................................................................3
*Riccardi v. Dep't of Just.*,
32 F. Supp. 3d 59 (D.D.C. 2014) ...............................................................4

*Shapiro v. Dep't of Just.*,
    40 F.4th 609 (D.C. Cir. 2022)..................................................................................3
*Spirko v. U.S. Postal Serv.*,
    147 F.3d 992 (D.C. Cir. 1998)..................................................................................6
*Trans-Pacific Policing Agreement v. U.S. Customs Serv.*,
    177 F.3d 1022 (D.C. Cir. 1999)................................................................................6
*Tao v. Freeh*,
    27 F.3d 635 (D.C. Cir. 1994)....................................................................................3
*U.S. Dep't of Justice v. Tax Analysts*,
    492 U.S. 136 (1989) ..................................................................................................5
*Vaughn v. Rosen*,
    523 F.2d 1136 (D.C. Cir. 1975)................................................................................5
*Weisberg v. Dep't of Just.*,
    705 F.2d 1344 (D.C. Cir. 1983)................................................................................5
*Weisberg v. Dep't of Just.*,
    745 F.2d 1476 (D.C. Cir. 1984)................................................................................4

**Statutes**

5 U.S.C. § 552(a)(4)(B)...............................................................................................5
5 U.S.C. § 552(b)......................................................................................................5, 6
5 U.S.C. § 552(b)(5)..........................................................................................1, 3, 10
5 U.S.C. § 552(b)(6)..........................................................................................1, 3, 16
5 U.S.C. § 552(b)(7)..........................................................................................1, 3, 20
5 U.S.C. § 552(b)(7)(A).............................................................................................2
5 U.S.C. § 552(b)(7)(C)....................................................................................1, 3, 16
5 U.S.C. § 552(b)(7)(E).....................................................................................1, 3, 21
5 U.S.C. § 552(b)(9)..................................................................................................25

**Rules**

Fed. R. Civ. P. 56(a).................................................................................................3

iii

Plaintiff, Finders Keepers, LLC, brought this Freedom of Information Act ("FOIA") action against the Department of Justice (the "Department"), and in particular its component, the Federal Bureau of Investigation ("FBI"), seeking records relating to an allegedly missing shipment of gold purportedly buried in Dents Run, Elk County, Pennsylvania.

As supported by this memorandum, accompanying declaration,[1] and *Vaughn* index, the Department conducted reasonable searches and properly withheld documents, or portions of documents, under FOIA Exemptions 5, 6, 7(C), and 7(E).  Accordingly, the Court should therefore grant summary judgment in favor of the Department.

## PRELIMINARY STATEMENT

The FBI processed a total of 2,501 responsive records, in paper and photograph formats, and produced three video segments totaling 43 minutes and 34 seconds of redacted digital video. Of the 2,501 paper and photograph records, the FBI released 1534 records in full, released 565 records in part, and withheld 402 records.  In addition, the FBI released three redacted video segments.  Of the 402 records withheld, 352 records were duplicates of previously processed records, and 50 records were withheld pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E).

## BACKGROUND

By electronic format dated May 9, 2018, Plaintiff submitted a FOIA request to the FBI seeking:

(1)     Copies of all public records pertaining to FBI's investigation of an alleged missing shipment of gold purportedly buried in Pennsylvania state forest land in Dents Run, Elk County, Pennsylvania;

---

[1]     The Department's motion for summary judgment is accompanied by a fourth declaration from Michael G. Seidel, Section Chief of the FBI's Record/Information Dissemination Section, Information Management Division ("Fourth Seidel Declaration") enclosed herewith as Exhibit 1.

(2)     Copies of all documents relied upon in support of request to Federal Court in Pittsburgh for authorization to dig at the site in Dents Run;

(3)     Copies of all communications with Enviroscan pertaining to scientific sampling and analysis of Dents Run, including the report on the Enviroscan findings;

(4)     Copies of all requisitions for expenditures associated with the investigation at Dents Run;

(5)     Copies of inventory of items collected from the Dents Run site; and

(6)     Copies of authorization for FBI agents to commence investigation of the purported missing shipment of gold.

*See* Compl. ¶ 45, Ex. B thereto; *see also* 4th Seidel Decl. ¶ 4, Ex. A.  By letter dated May 23, 2018, the FBI informed Plaintiff it conducted a search of the Central Records System and was unable to identify any main file records responsive under the FOIA to Plaintiff's request.  *See* Seidel Decl. ¶ 5, Ex. B.  Thereafter, by letter dated September 28, 2018, the FBI advised Plaintiff it would conduct a further search for potentially responsive records.  *See* 4th Seidel Decl. ¶¶ 6-9, Ex. F.

By letter dated October 30, 2018, the FBI informed Plaintiff the material it requested was located in an investigative file exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A).  *See* 4th Seidel Decl. ¶ 11, Ex. H.  Plaintiff administratively appealed and by letter dated July 2, 2019, Plaintiff's request was remanded to the FBI for further processing of the responsive records previously withheld in their entirety.  *See* 4th Seidel Decl. ¶ 13, Ex. J.  By letter dated August 6, 2019, the FBI informed Plaintiff it had located approximately 2,378 pages of records potentially responsive to its request.  *See* 4th Seidel Decl. ¶ 15, Ex. L.

On January 4, 2022, Plaintiff filed this action with respect to its May 8, 2018, FOIA request. *See* ECF No. 1.  For additional background information, the Department respectfully refers the Court and Plaintiff to the accompanying Defendant's Statement of Undisputed Material Facts. The FBI processed a total of 2,501 responsive records, in paper and photograph formats, and

produced three video segments totaling 43 minutes and 34 seconds of redacted digital video.  Of the 2,501 paper and photograph records, the FBI released 1534 records in full, released 565 records in part, and withheld 402 records.  *See* 4th Seidel Decl. ¶¶ 3, 95. In addition, the FBI released three redacted video segments.  *Id.*  Of the 402 records withheld, 352 records were duplicates of previously processed records, and 50 records were withheld pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E).  *See* 4th Seidel Decl. ¶¶ 3, 95.

## LEGAL STANDARDS FOR SUMMARY JUDGMENT

FOIA requires disclosure of certain agency records, it recognizes "that public disclosure is not always in the public interest" and enumerates several categories of documents exempt from disclosure.  *CIA v. Sims*, 471 U.S. 159, 166–67 (1985); *see also Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001); *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (FOIA exemptions are "intended to have meaningful reach and application").

Summary judgment is appropriate if "there is no genuine issue as to any material fact" and the "movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  A genuine issue of material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.

"To prevail on summary judgment, an 'agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested,' which it can do by submitting '[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'"  *Shapiro v. Dep't of Just.*, 40 F.4th 609, 612-13 (D.C. Cir. 2022) (quoting *Reps. Comm. for Freedom of the Press v. FBI*, 877 F.3d 399, 402 D.C. Cir. 2017)); *see also Machado Amadis v. Dep't of State,* 971 F.3d

364, 368 (D.C. Cir. 2020) (an agency "must show that it 'conducted a search reasonably calculated to uncover all relevant documents.'").  "Agencies can satisfy this burden through a 'reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" *Id.* (citation omitted). Such affidavits are entitled to "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Id.* (citation omitted).  Reasonableness, not perfection, constitutes the Court's guiding principle in determining the adequacy of a FOIA search. *See Campbell v. Dep't of Just.*, 164 F.3d 20, 27 (D.C. Cir. 1998); *Riccardi v. Dep't of Just.*, 32 F. Supp. 3d 59, 63 (D.D.C. 2014).

Courts afford agency search declarations "a presumption of good faith and can be rebutted only with evidence that the agency's search was not made in good faith." *Riccardi*, 32 F. Supp. 3d at 63 (citations and internal quotations omitted). "There is no requirement that an agency search every record system." *Oglesby v. Dep't. of the Army*, 920 F.2d 57, 68 D.C. Cir. 1990). And relatedly, a failure to uncover a responsive document does not render the search inadequate; "the issue to be resolved is not whether there might exist any . . . documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Weisberg v. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis in original); *see also Perry v. Block*, 684 F.2d 121, 128-29 (D.C. Cir. 1982) (agency need not demonstrate that all responsive documents were found and that no other relevant documents could possibly exist).

The defendant agency holds the burden of proof to justify its decision to withhold any documents.  *DiBacco v. Dep't. of the Army*, 926 F.3d 827, 834 (D.C. Cir. 2019).  There should be "considerable deference" to an agency's judgment regarding what constitutes part of its "give-and-take" by which a decision is made, because the agency is best situated to understand the

confidentiality required to prevent injury to the quality of its decisions.  *Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 600 F. Supp. 114, 118 (D.D.C. 1984) (citing *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975), and *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975)).  An agency is entitled to summary judgment if it "proves that it has fully discharged its obligations" under the FOIA.  *Reliant Energy Power Generation, Inc. v. Fed. Energy Regulatory Comm'n*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007) (citing *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)).

FOIA requires that an agency release responsive information unless it is protected from disclosure by one or more of the FOIA's nine exemptions.  *See* 5 U.S.C. § 552(b); *see also Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 150–51 (1989).  The agency bears the burden of demonstrating that any withheld information falls into one or more of those exemptions.  5 U.S.C. § 552(a)(4)(B); *see also Nat. Res. Def. Council, Inc. v. Nuclear Regulatory Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000).  An agency may meet its burden to establish the applicability of an exemption by providing a *Vaughn* index that "permit[s] adequate adversary testing of the agency's claimed right to an exemption."  *Nat'l Treas. Emps. Union v. U.S. Customs Serv.*, 802 F.2d 525, 527 (D.C. Cir. 1986) (citing *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977); *Vaughn v. Rosen*, 484 F.2d 820, 828 (D.C. Cir. 1973).

Additionally, although a *Vaughn* index is a common device used by agencies to meet their burden of proof, "the Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"

*Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Lab.*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).   The justification for invoking a FOIA exemption need only be "logical" or "plausible."  *Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 137 (D.D.C. 2011) (citing *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)); *see also Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 998 n.4 (D.C. Cir. 1998) ("The form of the *Vaughn* index is unimportant and affidavits providing similar information can suffice.") (citing *Gallant v. NLRB*, 26 F.3d 168, 172-73 (D.C. Cir. 1994)).

Finally, FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this section."  5 U.S.C. § 552(b).  The D.C. Circuit has held that district courts have an affirmative obligation to consider this issue and make segregability findings.  *See Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

## ARGUMENT

The issues on summary judgment are whether the FBI (1) made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested; (2) properly withheld communications and memoranda underthe deliberative process privilege, pursuant to FOIA Exemption 5; (3) lawfully withheld names and other identifying information, pursuant to FOIA Exemption 6 and 7(C); (4) appropriately withheld non-public investigative techniques and procedures used by the FBI to pursue its law enforcement mission, and also non-public details about techniques and procedures that are otherwise known to the public; and (5) processed and released all reasonably segregable material.

## I.    **The FBI Conducted Adequate Searches for Potentially Responsive Records.**

Conducting a "reasonable" search is a process that requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise" and is "hardly an area in which the courts should attempt to micro-manage the executive branch." *Schrecker v. Dep't of Just.*, 349 F.3d 657, 662 (D.C. Cir. 2003) (quoting *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002)).  Additionally, speculative or hypothetical assertions are insufficient to raise a material question of fact with respect to the adequacy of an agency's search. *See, e.g., Lasko v. Dep't of Just.*, No. 10-5068, 2010 WL 3521595, at *1 (D.C. Cir. Sept. 3, 2010) (per curiam) (explaining that the adequacy of the search is not undermined by mere speculation that additional documents might exist); *Oglesby*, 920 F.2d at 67 n.13; *Elliott v. Nat'l Archives & Recs. Admin*., Civ. A. No. 06-1246 (JDB), 2006 WL 3783409, at *3 (D.D.C. Dec. 21, 2006) (noting that speculative claims about the existence of other documents cannot rebut the presumption of good faith accorded to agency declarations).

For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number consisting of three sequential components: (a) the Central Records System file classification number; (b) the abbreviation of the FBI office of origin opening the file; and (c) the assigned individual case file number for the particular subject matter. *See* 4th Seidel Decl. ¶ 35.  Within each case file, pertinent documents of interest are "serialized," or assigned a number in the order which the document is added to the file, typically in chronological order. *Id*.  Here, the FBI initially conducted searches of the Central Records System automated indices. *See* 4th Seidel Decl. ¶ 40.  The Central Records System is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI while fulfilling its mission and integrated functions as a law enforcement and intelligence agency, and in the fulfillment its administrative and personnel

functions.  *Id.* ¶ 34.  There are multiple Central Records System indices, including Sentinel on a variety of subject matters including individuals, organizations, events, and other subjects of investigative interest that are indexed for future retrieval.  *Id*. ¶ 36.  These indices are comparable to a digital version of a library's card catalog.  *Id*.  Sentinel is the FBI's case management system. *Id*. ¶ 38.

In response to Plaintiff's FOIA request, the FBI conducted a search for main file entries in the Sentinel indices.  *Id.* ¶ 41.  The FBI searched the indices using the following terms: "Dents Run" and "Civil War gold."  *Id.*  The FBI's search was limited to potentially responsive records indexed between January 15, 2018, and May 14, 2018, the date of the FBI's initial search for potentially responsive records.  *Id.*  The FBI determined a search of the Sentinel indices could reasonably locate records responsive under the FOIA for the following reasons:  Plaintiff requested specific records concerning an FBI investigation related to the alleged theft of U.S. gold in Elks County, PA, indexed between January 15, 2018, and May 14, 2018, a subject and date range reasonably expected to be indexed within the automated Sentinel indices available and accessed via the Sentinel search function; and the requested subject matter would have been indexed after the implementation of Sentinel.  *Id*.

As a result of the search, the FBI was able to locate one main file, FBI file number 374E-PH-2553532, potentially responsive to Plaintiff's request.  *Id*.  The FBI began interim releases of records beginning on May 18, 2022. *See* 4th Seidel Decl. ¶ 46, Ex. T.[2]

---

[2]     On or about October 15, 2018, the Philadelphia Field Office advised that the case was still pending, and that no records could be released at the time due to the pendency of their investigation. Accordingly, the FBI informed Plaintiff by letter dated October 30, 2018, that the material responsive to Plaintiff's request was located within an investigative file exempt from disclosure pursuant to FOIA Exemption (7)(A).  *See* 4th Seidel Decl. ¶ 44, Ex. H.  Thereafter, the case was closed, and the FBI began interim releases of records.  *Id.* ¶ 46, Ex. T.

Thereafter, the FBI received from Plaintiff a lead about additional videotaping at the site. *See* 4th Seidel Decl. ¶¶ 47-48.  The FBI then conducting a targeted search outside the Central Records System.  *Id.*  The Philadelphia Field Office was contacted to determine who the individual was in the video and whether any videos of the Dents Run dig site were in existence other than the four that were in the FBI's Main Investigative File.  *Id.* ¶ 48. Further researched determined that the individual pictured was an employee of the FBI's Office of Public Affairs.  *Id.*  The Public Affairs Office was contacted to determine whether it possessed any videos taken at Dent's Run dig site.  *Id.*  The Public Affairs Office confirmed that a Public Affairs Office individual was on the Dents Run dig site who recorded 65 "video clips."  *Id.*  The 65 "video clips" had not been uploaded into the FBI's main investigative file, which accounts for RIDS not locating them during the initial search.  *Id.*

These efforts to locate responsive records were "reasonably calculated to uncover all relevant documents." *Weisberg*, 745 F.2d at 1485. Thus, "the searches were reasonably tailored to plaintiffs' requests and therefore adequate." *Performance Coal Co. v. Dep't of Labor*, 847 F. Supp. 2d 6, 13 (D.D.C. 2012). Thus, the FBI conducted a manual and electronic search reasonably calculated to lead to discovery of responsive records.  Accordingly, Defendant is entitled to summary judgment on the issue of the adequacy of the searches.

Ultimately, the FBI processed a total of 2,501 responsive records, in paper and photograph formats, and produced three video segments totaling 43 minutes and 34 seconds of redacted digital video.  Of the 2,501 paper and photograph records, the FBI released 1534 records in full, released 565 records in part, and withheld 402 records.  *See* 4th Seidel Decl. ¶¶ 3, 95. In addition, the FBI released three redacted video segments.  *Id.*  Of the 402 records withheld, 352 records were duplicates of previously processed records, and 50 records were withheld pursuant to FOIA

Exemptions 5, 6, 7(C), and 7(E).  *Id.*

## II.    The FBI Appropriately Withheld Deliberative Process Material Pursuant to Exemption 5.

FOIA Exemption 5 protects from public disclosure "inter-agency and intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5); *see also* 21 C.F.R. § 20.62.  It protects all communications that are normally privileged in the civil discovery context.  *Sears*, 421 U.S. at 149.  Here, the Department invoked the deliberative process privilege, and withheld exempt information from responsive documents under Exemption 5. 5 U.S.C. § 552(b)(5).

The FBI withheld privileged, deliberative information within Bates pages 1142-1146, and 2066-2071.[3]  Draft documents were withheld in this case, specifically, the FBI agents' investigative site survey notes and sketches, which were taken during a preliminary investigation site visit at Dents Run. They contain shorthand notes containing thoughts, ideas, impressions, and visual interpretations (sketch of site location).  *See* 4th Seidel Decl. ¶¶ 59-60.  As explained below, the reasonably foreseeable harm that would result from the release of this information would be a chilling effect on agency employees' willingness to document their true observations, thoughts, and inferences within their notes.  *Id.* ¶ 61.  If the Special Agent's handwritten notes and sketches were subject to disclosure, Special Agents might in the future hesitate to document their unfiltered thoughts within those notes, which could damage investigations by reducing the amount of observations and facts that end up in the written record.  Ultimately, disclosure of these notes would reveal information that was not incorporated into a final report and would cause FBI employees to be circumspect in their notetaking, which would result in harm to FBI investigations.

---

[3]    As referenced in the *Vaughn* index, the other pages reflect application of Exemption 5 were duplicates or near duplicates.  *See* Vaughn index at 50, 87, 90-98

The enclosed Fourth Seidel Declaration and the *Vaughn* Index describe the specific foreseeable harm that would result from the disclosure of material withheld pursuant to this privilege for each such record.  *Id.* ¶ 61.

The deliberative process privilege protects communications that would expose the deliberative processes of the agency if disclosed.  *Montrose Chem. Corp. v. Train*, 491 F.2d 63, 68–71 (D.C. Cir. 1974).  The deliberative process privilege may be invoked when an inter-agency or intra-agency document is: (1) "predecisional," meaning it was prepared to assist an agency decisionmaker in arriving at a final decision, *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (agency recommendations were predecisional because they were created before the adoption of an agency policy); and (2) "deliberative," meaning it is a part of the deliberative process and makes recommendations or expresses opinions on legal or policy matters, *Vaughn*, 523 F.2d at 1143–44.

FOIA also requires that agencies may only withhold a document under a FOIA exemption if the agency "reasonably foresees that disclosure would harm an interest protected by an exemption" or if "disclosure is prohibited by law[.]" FOIA Improvement Act § 2, 130 Stat. at 539 (codified at 5 U.S.C. § 552(a)(8)(A)(i)).  The policy interests underlying the deliberative process privilege include the encouragement of open discussions on policy matters between subordinates and superiors, protection against premature disclosure of proposed policies before final adoption, and prevention of public confusion that could result from premature disclosure.  *See, e.g.*, *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021); *Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980); *Jordan v. Dep't of Just.*, 591 F.2d 753, 772–73 (D.C. Cir. 1978) (en banc).

The FBI's withholdings were proper because: (1) the withheld records are pre-decisional; (2) the withheld records are deliberative; and (3) the FBI reasonably foresees that the disclosure of the withheld records would harm an interest protected by Exemption 5.

A document is predecisional if it is "generated before the adoption of an agency policy." *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (quoting *Coastal States Gas Corp.*, 617 F.2d at 866). The issue turns not on whether an agency can necessarily point to a final decision but whether the document contributes to a larger process of agency decisionmaking. *Access Reports v. Dep't of Just.*, 926 F.2d 1192, 1196 (D.C. Cir. 1991) (upholding the use of the deliberative process privilege where a withheld memorandum contributed to an agency's decisionmaking process regarding how to respond to critics of proposed amendments to FOIA). An agency can expressly choose to adopt or incorporate by reference the document in a final decision. *See*, *e.g.*, *Sears*, 421 U.S. at 161; *Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1, 10 (D.C. Cir. 2014). However, the burden is on the requestor to demonstrate express adoption or incorporation. *Elec. Frontier Found.*, 739 F.3d at 11.

Here, the exempt information is pre-decisional because these documents were generated during a preliminary investigation site visit at Dents Run. *See* 4th Seidel Decl. ¶ 61. The shorthand notes contain the agents' thoughts, ideas, impressions, and visual interpretations, including a sketch of site. *Id.* When agents take such unvarnished notes and comb through them for relevancy, time frame, and accuracy, they make decisions as to the validity of the information within the notes and they edit preliminary thoughts for incorporation into a final product. *Id.* That decision is always in progress regarding handwritten notes and sketches in that notes are taken to memorialize preliminary thoughts. *Id.* The subsequent editing process prior to the creation of a formal report requires excisions, additions, and changes. *Id.* The unfinalized handwritten notes are a draft, and

until finalized in the official record Form FD-302, can change as the document is being edited. *Id.* The handwritten notes predate the final agency decisions and reflect the give and take of deliberations, through the editing process, which leads to final, refined products. *Id*.

To be deliberative, the document must reflect the "give-and-take of the consultative process" by assessing the merits of a viewpoint or articulating the process used to reach a decision. *Coastal States*, 617 F.2d at 867 (holding that the deliberative process privilege covers documents that reflect the opinions of the writer rather than the policy of the agency). Like the "predecisional" prong discussed above, the issue centers on the role of the document within an agency process— whether its communication is a "direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn*, 523 F.2d at 1143–44. Courts must examine the context in which the information is used, the role the information plays in the context, and the harm its release would do to the decisionmaking process. *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1123–24 (D.C. Cir. 1989). Although purely factual information generally is not protected by the deliberative process privilege because it does not expose staff opinions or deliberations, the line between factual and deliberative information is not straightforward—factual information must therefore be examined in the context in which it is used and in light of the purpose underlying the privilege. *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc); *see Brannum v. Dominguez*, 377 F. Supp. 3d 75, 83 (D.D.C. 2005) (holding that factual material still fell within Exemption 5 because they were used by agency personnel to develop recommendations to a decisionmaker and thus implicated the policy purposes of Exemption 5); *Elec. Frontier Found.*, 739 F.3d at 12 (finding that an entire document, including factual material, "'reflects the full and frank exchange of ideas'" so that factual portions "'could not be released without harming the deliberative processes of the

government'" (citations omitted)).

Here, the information was deliberative because when agents take notes, and subsequently comb through them for relevancy, time frames, and accuracy, they make decisions as to the validity of the information within the notes and they edit preliminary thoughts for incorporation into a final product.  *See* 4th Seidel Decl. ¶ 61.  Notes are taken to memorialize preliminary thoughts.  *Id.*  The editing process requires excisions, additions, and changes.  *Id*.  The handwritten notes and sketches, because they are not finalized, are considered a draft.  *Id.*  Until finalized in the official record Form FD-302, the preliminary notations can change as the document is being edited.  *Id.*

The FBI reasonably foresees that disclosure of such information would have a chilling effect on discussions within the agency in the future, discouraging frank and open dialogue among agency employees in the formulation of agency positions.  *See* 4th Seidel Decl. ¶ 61.  The Seidel Declaration and the attached *Vaughn* Index describe the specific foreseeable harm that would result from the disclosure of material withheld pursuant to this privilege for each such record.  *See* 4th Seidel Decl. ¶ 61.

The deliberative process privilege "reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options" and "an understanding that employees would be chilled from such rigorous deliberation if they feared it might become public."  *Jud. Watch, Inc. v. Dep't of Def.,* 847 F.3d 735, 739 (D.C. Cir. 2017).  The privilege also "avoids confusion from premature disclosure of ideas that are not— or not yet—final policy, and misimpressions from 'dissemination of documents suggesting reasons and rationales' not ultimately relied on."  *Id.* (quoting *Coastal States*, 617 F.2d at 866).

Here, if the raw notes and sketches were disclosed, in the future FBI agents might hesitate to document their unfiltered, candid, objective thoughts within those notes. *See* 4th Seidel Decl.

¶ 62.   This could damage investigations by reducing the amount of observations and facts that end up in the written record. *Id.* Ultimately, disclosure of these notes would reveal information that was not incorporated into a final report.  *Id.*  Disclosure would cause FBI employees to be circumspect in their notetaking, which would result in harm to FBI investigations.  *Id.* Accordingly, the descriptions in the Seidel Declaration and the *Vaughn* index sufficiently establish that the FBI properly withheld information protected by the deliberative process privilege. This Court should uphold the Department's withholdings pursuant Exemption 5.

**III.    The FBI Appropriately Withheld Names and Other Identifying Information Pursuant to Exemptions 6 and 7(C).**

The FBI appropriately withheld the names and other identifying information of (1) FBI agents and professional staff.  *See* 4th Seidel Decl. ¶¶ 68-70; (2) third parties who were merely mentioned in the investigative records. *Id.* ¶ 71; (3) local law enforcement employees.  *Id.* ¶ 72; (4) individuals who were interviewed, and provided information by other means, to the FBI during its investigation.  *Id.* ¶¶ 73-74; (5) personnel from non-FBI, federal government agencies, who provided information to or otherwise assisted the FBI in its investigation.  *Id.* ¶ 75; (6) commercial institution employees who assisted the FBI during investigation.  *Id.* ¶ 76; and (7) third parties who were of investigative interest to the FBI.  *Id.* ¶ 77.  As explained below, the FBI's redaction of the employees' and third-party individuals' identifying information properly balanced the privacy interests of those involved against the minimal public need for disclosure.[4]

---

[4]     The FBI applied Exemptions 6 and 7(C) to make redactions  on the following pages: 0001-0003; 0007; 0010-0011; 0016; 0064-95; 96; 0100-0110; 0115-0122; 0188-0190; 0199; 0203-0205; 0209; 0215; 0419-0420; 0422-0425; 0428-0431; 0476; 0535-0538; 0723-0724; 0730-0731; 0734-0735; 0076-0766; 0843; 0845; 0948-0949; 0952-0953; 0956-0957; 0960-0961; 1033-1044; 1049; 1062-1068; 1083; 1085-1086; 1089; 1092-1099; 1101-1104; 1110; 1112; 1123-1129; 1142-1146; 1149-1154; 1163-1206; 1208-1441; 1448-1451; 1455-1464; 1495-1510; 1616; 1618; 1674; 1680-1683; 1688; 1690; 1694; 1831-1835; 1840-1842; 1888-1892; 1894; 1936-1941; 1954-1956; 1973; 1979-2000; 2005-2012; 2014; 2060; 2064; 2066-2068; 2072-2073; 2075; 2083; 2114; 2117; 2121-

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(6).[5] Exemption 7(C) protects "records or information compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). While similar, Exemption 7(C) is thus "broader" than the standard for withholding under Exemption 6. *Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 756 (1989). The FBI properly applied exemptions 6 and 7(C) to the withheld information. Indeed, the D.C. Circuit has held "categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991); *see also McGehee v. Dep't of Just*, 800 F. Supp. 2d 220, 233 (D.D.C. 2011) (upholding Exemption 7(C) withholdings by the FBI to protect "names and/or identifying information of: 1) Third Parties Merely Mentioned . . . 3) FBI Agents and Support Personnel . . . 5) Local and/or State Government Employees . . . 6) Third Parties of Investigative Interest"). If disclosure of personnel information would threaten a substantial privacy interest by, for example, opening up employees to "embarrassment and harassment in the conduct of their official duties,"

---

2122; 2131-2146; 2370-2372; 2374; 2377-2379; 2381; 2384-2389; 2391-2394; 2464; 2469-2474; 2476-2479; 2482-2484; 2487; 2492-2493; 2495-2497; and videos. *See Vaughn* index.

[5]     "The Supreme Court has read Exemption 6 broadly," interpreting "similar files" to include "bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy." *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 152–53 (D.C. Cir. 2006) (internal quotation marks omitted); *see also Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982); *Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999) ("The Supreme Court has interpreted the phrase 'similar files' to include all information that applies to a particular individual."); *Gov't Accountability Project v. Dep't of State*, 699 F. Supp. 2d 97, 105-06 (D.D.C. 2010).

*Cleveland v. United States*, 128 F. Supp. 3d 284, 300 (D.D.C. 2015), then a reviewing court must balance the "privacy interests involved" against the "public interest" in "open[ing] agency action to the light of public scrutiny," *Jud. Watch*, 449 F.3d at 153. The work telephone and e-mail addresses of particular agency employees constitute information that "can be identified as applying" to individuals. *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015). Importantly, the contact information for individual employees sheds little, if any, "light on an agency's performance of its statutory duties. *Reps. Comm.*, 489 U.S. 749, 773 (1989).

Here, the FBI properly applied Exemptions 6 and 7(C) to redact identifying information.

1.      *FBI Special Agents and Professional Staff* – These FBI personnel conducted, supervised, or maintained the investigation activities, and investigated potential cultural property crimes related to stolen U.S. property.  *See* 4th Seidel Decl. ¶ 68.  The release of an agent's or staffer's identifying information in connection with a particular investigation could, among other things, trigger hostility toward those people. *Id.* ¶¶ 69-70.  The identities of these people would not significantly increase the public's understanding of the FBI's operations and activities.  *Id.* Thus, disclosure of this information would constitute an unwarranted invasion of their personal privacy. *Id.*

2.      *Third Parties Merely Mentioned* – The FBI has information about these third parties in its files because these individuals were tangentially mentioned in conjunction with FBI investigative efforts and were not of investigative interest.  *Id.* ¶ 71.  These third parties maintain substantial and legitimate privacy interests in not having this information disclosed and identified as being connected with an FBI law enforcement matter.  *Id.*  Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory inferences and

17

suspicion on them.  *Id*.  The identities of these people would not significantly increase the public's understanding of the FBI's operations and activities.  *Id*.

3.  *Local Law Enforcement Personnel* – These employees were acting in their official capacities and aided the FBI in the law enforcement investigative activities reflected in the records responsive to Plaintiff's request.  *Id*. ¶ 72.  The same rationale for protecting the identities of FBI agents and professional staff, discussed above, applies equally to the names and identifying information of these local law enforcement employees.  *Id.*

4.  *Third Parties Who Provided Information* – These individuals were interviewed and provided information by other means, to the FBI during its investigation.  *Id*. ¶ 73.  Plaintiff did not provide privacy waivers with its FOIA request for any third parties authorizing release of their information, nor has Plaintiff supplied any proofs of death.  *Id.*  Accordingly, these individuals maintain substantial and legitimate privacy interests in not having their cooperation or connection to the FBI law enforcement matters disclosed.  *Id.*  Disclosure of these individuals' names and other identifying information in connection with FBI records carries an extremely negative connotation, and could lead to harassment, and legal or economic detriment.  *Id*. ¶¶ 73-74.  There is no public interest in the disclosure of this information because disclosure of these third parties' names and identifying information would not shed light on or significantly increase the public's understanding of the operations and activities of the FBI.  *Id*. ¶ 74.

5.  *Non-FBI Federal Government Personnel* – These are personnel from non-FBI, federal government agencies, who provided information to or otherwise assisted the FBI in its investigation.  *Id*. ¶ 75.  Publicity, adverse or otherwise, concerning the assistance of these other agency employees in an FBI investigation would seriously impair their effectiveness in assisting or participating in future FBI investigations, or their own agency duties.  *Id.*  There is no public

interest to be served by the disclosure of these employees' names and identifying information because their identities, by themselves, would not demonstrate how the FBI performed its statutory mission and thus, would not significantly increase the public's understanding of the FBI's operations and activities. *Id*.

6.   *Commercial Institution Personnel* – These are private, commercial institution employees who assisted the FBI during its investigation. *Id.* ¶ 76. Identifying these individuals in connection to a law enforcement investigation could subject them to unofficial inquiries for information related to their assistance, not anticipated by their contact with the FBI. *Id.* There is no public interest to be served by publicly disclosing their identities as doing so would not increase public understanding of FBI operations and activities. *Id.*

7.   *Third Parties of Investigative Interest* – These third parties who were of investigative interest to the FBI. *Id.* ¶ 77. Being identified as a subject of FBI investigative interest carries a strong negative connotation and a stigma, irrespective of whether these individuals ever committed criminal acts. *Id.* Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. *Id.* Further, it could result in professional and social repercussions, due to resulting negative stigmas. *Id.* There is no public interest to be served by publicly disclosing personal information about these individuals as doing so would not significantly increase the public's understanding of the FBI's performance of its mission. *Id.*

As further explained the Seidel Declaration, the balance clearly weighs in favor of the individuals' privacy. Therefore, the Exemption 6 withholdings of employee contact information is proper under Exemption 6. *See, e.g., Jud. Watch*, 449 F.3d at 153 (names and addresses);

*Cleveland*, 128 F. Supp. 3d at 300 (mobile phone number).  Accordingly, Defendant is entitled to judgment as a matter of law on its invocation of FOIA Exemptions 6 and 7(C).

**IV.**      **The FBI Properly Withheld Information Pursuant to FOIA Exemption 7(E).**

FOIA Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes," but only to the extent that disclosure of such records would cause an enumerated harm. 5 U.S.C. § 552(b)(7); *see FBI v. Abramson*, 456 U.S. 615, 622 (1982). To withhold materials properly under Exemption 7, an agency must establish that the records at issue were compiled for law enforcement purposes, and that the material satisfies the requirements of one of the subparts of Exemption 7. *See Pratt v. Webster*, 673 F.3d 408, 413 (D.C. Cir. 1982). In assessing whether records are compiled for law enforcement purposes, the "focus is on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Jefferson v. Dep't of Just.*, 284 F.3d 172, 176-77 (D.C. Cir. 2002) (citations and internal quotations omitted).

"[T]he term 'law enforcement purpose' is not limited to criminal investigations but can also include civil investigations and proceedings in its scope." *Mittleman v. Off. of Pers. Mgmt.*, 76 F.3d 1240, 1243 (D.C. Cir. 1996) (citing *Pratt*, 673 F.2d at 420 n.32). When, however, a criminal law enforcement agency invokes Exemption 7, it "warrants greater deference than do like claims by other agencies." *Keys v. Dep't of Just.*, 830 F.2d 337, 340 (D.C. Cir. 1987) (citing *Pratt*, 673 F.2d at 418). A criminal law enforcement agency must simply show that "the nexus between the agency's activity . . . and its law enforcement duties" is "based on information sufficient to support at least 'a colorable claim' of its rationality." *Keys*, 830 F.2d at 340 (quoting *Pratt*, 673 F.2d at 421).

FOIA Exemption 7(E) provides protection for all information compiled for law enforcement purposes when release "would disclose techniques and procedures for law

enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E); *see also Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) ("the importance of deterrence explains why the exemption is written in broad and general terms" and further explains why the exemption looks "not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk"). The first clause of Exemption 7(E) affords "categorical" protection for "techniques and procedures" used in law enforcement investigations or prosecutions. *Smith v. Bureau of Alcohol, Tobacco & Firearms*, 977 F. Supp. 496, 501 (D.D.C. 1997) (citing *Fisher v. Dep't of Just.*, 772 F. Supp. 7, 12 n. 9 (D.D.C. 1991), *aff'd*, 968 F.2d 92 (D.C. Cir. 1992)).  The D.C. Circuit "sets a relatively low bar for the agency to justify withholding" information under Exemption 7(E)."  *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011).  The exemption allows for withholding information in the face of "not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk."  *Mayer Brown,* 562 F.3d at 1193.

Here, the FBI applied Exemption 7(E) to non-public investigative techniques and procedures used by the FBI in pursuit of its law enforcement mission, and to non-public details about techniques and procedures that are otherwise known to the public.  *See* 4th Seidel Decl. ¶¶ 78-79.  Specifically, the FBI applied this exemption to protect (1) security fax numbers, non-published internal FBI phone numbers, internal e-mail and IP addresses, non-public intranet web addresses, and secure internal e-mail tools.  *Id*.  ¶ 80; (2) methods and techniques involving the location and identity of FBI units, and squads involved in the investigation.  *Id*. ¶ 83; (3) sensitive

investigative database information and search results located through queries of its e-tip database used for official law enforcement purposes by the FBI. *Id.* ¶ 85; (4) sensitive investigative file numbers. *Id.* ¶ 88; (5) details of FBI Operational Plans. *Id.* ¶ 92; and (6) specific sensitive collection methodology for collection of evidence the FBI used during this investigation. *Id.* ¶ 93.

As set forth in the Seidel Declaration, the disclosure of security fax numbers, non-published internal FBI phone numbers, internal e-mail and IP addresses, non-public intranet web addresses, and secure internal e-mail tools would provide criminals, not specifically related to this investigation, with FBI targets for possible cyber-attacks and attacks on FBI secure communications, harassing faxes, and e-mails seeking information concerning FBI investigations, and specific targets for attacks on FBI communications through "spoofing" or other illegal means. *See* 4th Seidel Decl. ¶¶ 80-82.  Releasing this information poses substantial risks to FBI information systems, could potentially decrease the FBI's effectiveness, and could enable criminals to circumvent the law. *Id.*

Similarly, disclosure of the location of FBI units and squads conducting the investigation would reveal the targets, the physical areas of interest of the investigation, and when taken together with the other locations if identified, could establish a pattern or "mosaic" that identification of a single location would not. *Id.* ¶¶ 83-84.  If the locations are clustered in a particular area, it would allow criminals to avoid those locations of FBI interest, especially if one or more locations appeared with frequency or in a pattern. *Id.* ¶ 83.  This would disrupt the method of the investigative process and deprive the FBI of valuable information. *Id.*

Further, disclosing the information generated through queries of the FBI's investigative database would reveal the nature of their utility to FBI investigators and the scope of information stored within the databases, providing information about FBI investigative strategies. *Id.* ¶ 86. It

22

would expose possible intelligence gaps and/or intelligence gathering strengths. This would allow criminals to make informed decisions on how they might structure their behavior to exploit these strengths and weaknesses and avoid detection and/or disruption by the FBI. *Id.* Release of this information relative to FBI investigation impedes the FBI's effectiveness and potentially aids in circumvention of valuable investigative techniques. *Id.* ¶ 87.

The FBI file numbers are not known to the public. *Id.* ¶ 88. These file numbers contain three separate portions. *Id.* The first part of these file numbers consist of FBI file classification numbers which indicate the types of investigative or intelligence gathering program to which these files pertain. *Id.* The second part of the file numbers contains two letter office of origination codes, indicating which FBI field office or overseas FBI legal attaché originated the investigations at issue. *Id.* ¶ 89. The third part consists of the numbers given to the unique investigative initiatives these files were created to memorialize. *Id.* ¶ 90. Releasing sensitive FBI investigative file numbers would allow criminals and foreign adversaries to obtain an exceptional understanding of the body of investigative intelligence available to the FBI, and where, who, what, and how the FBI is investigating. *Id.* ¶ 91. Also, the release of this information would enable these criminals and foreign adversaries to predict FBI investigations and structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law. *Id.*

Operational plans are developed for the purpose of successfully executing investigative actions. *Id.* ¶ 92. These plans often include strategies for surveillance, placement of personnel, communications during the operations, contingency/abort plans, administrative and equipment information, targets' background information. *Id.* The release of such plans would allow non-law enforcement to predict the FBI's strategies during the investigation and bolster their own operational security to avoid detection during their own search efforts. *Id.* Additionally, release

of Operational Plans could potentially risk the lives of FBI agents and other law enforcement personnel executing these plans.  *Id.*

Finally, the release of evidence collection methods would disclose the identity of a sensitive collection method used, including how and from where the FBI collected this information and the sensitive methodology employed.  *Id.* ¶ 93.  This would enable subjects of FBI investigations to circumvent similar currently used techniques.  *Id.* The technique's effectiveness would be diminished if the actual technique was released in this matter, facilitating the accumulation of information by investigative subjects regarding the circumstances under which the specific technique was used or requested and the usefulness of the information obtained.  *Id.*  Criminals could educate themselves about the technique employed in this investigation and take countermeasures to circumvent the effectiveness of this technique pertaining to their own investigations and to continue to violate the law and engage in intelligence, terrorist, and other criminal activities.  *Id.*

In sum, the disclosure of this information "would disclose techniques and procedures for law enforcement investigations or prosecutions or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  Accordingly, summary judgment in favor of Defendant is appropriate.

## V.     **The FBI Reasonably Segregated Non-Exempt Information.**

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." *See* 5 U.S.C. § 552(b)(9). To establish that all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578–79 (D.C. Cir. 1996); *Canning v. Dep't of Just.*, 567 F. Supp. 2d 104, 110 (D.D.C.

2008). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). And a reviewing court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. Dep't of Just.*, 518 F.3d 54, 61 (D.C. Cir. 2008).

Here, the FBI processed 2,501 pages of paper and photographs as well as three video segments.  4th Seidel Decl. ¶ 95.  The FBI processed the records under the access provisions of the FOIA to achieve maximum disclosure.  *Id.* ¶ 96.  Every effort was made to provide Plaintiff with all information in the public domain and with all reasonably segregable, non-exempt information. *Id.* ¶ ¶ 51, 62.  The FBI carefully examined the documents and determined the information withheld from Plaintiff in this case, if disclosed, would reveal privileged information; would cause a clearly unwarranted invasion of the personal privacy, or could reasonably be expected to constitute an unwarranted invasion of personal privacy; and would disclose techniques and procedures for law enforcement investigations.  *Id.* ¶ 96. After extensive review of the documents at issue, the FBI determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information.  Id. ¶ 96.  The FBI did not withhold any reasonably segregable, nonexempt portions from Plaintiff.  *Id.* ¶ 51.[6]

---

[6]     As set forth above, the FBI processed a total of 2,501 responsive records, in paper and photograph formats, and produced three video segments totaling 43 minutes and 34 seconds of redacted digital video.  *See* Seidel Decl. ¶¶ 3, 95.  Of the 2,501 paper and photograph records, the FBI released 1534 records in full, released 565 records in part, and withheld 402 records.  *Id.*  In addition, the FBI released three redacted video segments.  *Id.*  Of the 402 records withheld, 352 records were duplicates of previously processed records, and 50 records were withheld pursuant to FOIA Exemptions.  *Id.*

Thus, as described in the Seidel Declaration, the FBI conducted segregability analyses of all withheld records and made every effort to release all segregable information to Plaintiff. Accordingly, summary judgment in the Defendants' favor is warranted, as Defendants have established that the information withheld in full could not be reasonably segregated. *Armstrong*, 97 F.3d at 578-79.

## CONCLUSION

For the above reasons, Defendant respectfully requests that the Court grant summary judgment in its favor.

Dated: December 21, 2022

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

BRIAN HUDAK
Chief, Civil Division

By:    */s/ T. Anthony Quinn*
T. ANTHONY QUINN
Assistant United States Attorney
D.C. Bar No. 415213
United States Attorney's Office
Civil Division
601 D Street, NW
Washington, D.C. 20530
(202) 252-7558
Tony.Quinn2@usdoj.gov

*Counsel for the United States of America*