## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FINDERS KEEPERS USA, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 22-cv-00009 (APM)** |
| ) | |
| **UNITED STATES** ) | |
| **DEPARTMENT OF JUSTICE,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

### I.

This is a Freedom of Information Act ("FOIA") case about lost treasure—lost gold to be more precise. "According to folklore—as well as newspaper and magazine articles dating back to the 1960s and 1970s—a shipment of gold transported by Union soldiers on their way to the U.S. Mint in Philadelphia was stolen and buried somewhere in the hills of Elk County," Pennsylvania. In June 1863, a caravan of wagons and armed horsemen reportedly set out for Philadelphia with 26 gold ingots painted black. The group apparently got lost. The Union soldiers were never seen again, but their wagons were found abandoned without any gold. The stagecoach robbers purportedly buried the gold in Dents Run in Elk County.

Fast forward to March 2018. Based on information received from a trio of treasure hunters, the FBI obtained a seizure warrant to dig for the lost gold in Dents Run. The dig occurred over two days. The FBI may have found the gold—or maybe not. Local residents reported seeing and hearing loud excavating activity at the site. Some saw armored trucks driving away from Dents Run the morning of the second day of the dig. The FBI invited the treasure hunters to the dig site,

where they saw a large excavated hole, but the FBI advised them that there was nothing in the hole.  The FBI refused to answer whether it had found any gold.

Plaintiff Finders Keepers USA, LLC ("Finders Keepers") turned to FOIA to try to unearth the truth.  It sought records from the FBI concerning the dig at Dents Run.  Only after filing suit did Plaintiff receive records, photographs, and videos—none showing the discovery of any gold.  Not satisfied with what it received, Plaintiff now challenges the scope of the FBI's search and its withholdings.  For the reasons explained, the court finds that the FBI has more to do to satisfy its obligations under FOIA.

## II.

### A.

Finders Keepers is a "lost treasure locate-and-recovery service located in Clearfield, Pennsylvania" owned by Dennis and Kem Parada, a father and son treasure hunting team.  Compl., ECF No. 1, ¶¶ 4, 14.  For many years, the Paradas have searched "for Civil War-era gold rumored to be buried in Elk County, Pennsylvania."  *Id.* ¶ 14.

Starting in 2004, the Paradas visited the Dents Run site approximately 300 times.  *Id.* ¶ 18.  "Using a variety of metal detecting instruments, including a Ground Penetrating Locator . . . and a Surface Ground Penetrating Radar," the Paradas "detected a large cache of metal in an underground chambered cave."  *Id.*  Readings obtained from "more than 100 remote, surface-based scans with the [Ground Penetrating Locator] over a three-year period suggested the highly-conductive metal was gold."  *Id.*  "[W]hile drilling a small inspection borehole at the site," the Paradas also spotted specks of a gold-colored material.  *Id.*

In January 2018, the Paradas and a journalist, Warren Getler, met with two agents from the FBI's Art Crime Team and an assistant U.S. Attorney at the U.S. Attorney's Office in Philadelphia.

*Id.* ¶¶ 20, 29.  The three men informed the government about their findings and belief that the Civil War-era gold was hidden in Dents Run.  *Id.*  Following the meeting, the FBI hired Enviroscan, a geophysics company based in Lancaster, Pennsylvania, to conduct an underground detection survey of the location believed to contain the gold.  *Id.* ¶¶ 25–26.  With the use of a highly sensitive gravimeter, Enviroscan recorded "a very large, dense object" at the suspected location.  *Id.* ¶ 26. In the first week of March 2018, the FBI special agent in charge notified Dennis Parada and Getler that the "results from the gravimeter scan were positive for gold."  *Id.* ¶ 27.

The following week, on March 9, 2018, the FBI "filed an application for a warrant to seize property subject to forfeiture in the U.S. District Court for the Eastern District of Pennsylvania." *Id.* ¶ 28.  The application listed various facts establishing "probable cause to believe that a significant cache of gold is secreted in the underground cave located at GSP coordinates on the Dents Run Site" and "the buried gold was stolen from and belongs to the United States."  *Id.* ¶¶ 33– 34.  A magistrate judge granted the application the same day.  *Id.* ¶ 36.

The FBI notified the Paradas and Getler that the dig to recover the gold would take place on March 13, 2018.  *Id.* ¶ 37.  The dig occurred over two days.  *Id.* ¶¶ 38–39.  On the second day, the Paradas and Getler "observed 30 or more FBI agents standing near a deep, fully excavated hole at a depth of approximately 13 feet."  *Id.* ¶ 39.  "The FBI agent in charge noted that nothing was in the hole but refused to answer Dennis Parada's question as to whether they had found any gold." *Id.*  After leaving that day, the Paradas and Getler heard nothing from the FBI.  *Id.*

"A few days after the FBI completed its dig at Dents Run, an off-duty Pennsylvania police officer told the Paradas and Mr. Getler that he had witnessed two 'Brinks' type armored trucks supported by two Humvees and a black SUV with satellite communication antennae driving from

the Dents Run area past the nearby town of Weedville at approximately 10:00 a.m. on March 14, 2018." *Id.* ¶ 43.  Other local residents provided similar accounts. *Id.* ¶¶ 43–44.

**B.**

On May 8, 2018, Plaintiff submitted a FOIA request to the FBI.  Plaintiff requested the following records, beginning from January 15, 2018:

(1) Copies of all public records pertaining to the FBI's investigation of an alleged missing shipment of gold purportedly buried in Pennsylvania state forest land in Dents Run, Elk County, Pennsylvania;

(2) Copies of all documents relied upon in support of a request to the Federal Court in Pittsburgh for authorization to dig at the site in Dents Run;

(3) Copies of all communications with Enviroscan pertaining to scientific sampling and analysis of Dents Run, including the report on the Enviroscan findings;

(4) Copies of all requisitions for expenditures associated with the investigation at Dents Run;

(5) Copies of the inventory of items collected from the Dents Run site; and

(6) Copies of authorization for FBI agents to commence an investigation of the purported missing shipment of gold.

*Id.* ¶ 45.

On May 23, 2018, the FBI notified Plaintiff that it had "conducted a search of the Central Records System and was unable to identify any main file [responsive] records."  Fourth Decl. of Michael Seidel, ECF No. 37-1, ¶ 5 [hereinafter Seidel Decl.].  Plaintiff, for good reason, suspected that the FBI's search was inadequate.  Plaintiff sought the assistance from Senator Pat Toomey of Pennsylvania, whose office urged the FBI to produce the requested records.  Compl. ¶ 47.  The

FBI then conducted another search, and this time it located "one main file . . . potentially responsive to Plaintiff's request." Seidel Decl. ¶ 44. FBI records indicated that an investigation was still pending, a fact confirmed by the FBI's Philadelphia field office. *Id.* Thereafter, the FBI advised Plaintiff that it was withholding all responsive records under Exemption 7(A). *Id.* Plaintiff appealed the withholding, which resulted in a remand "to the FBI for further processing of responsive records." *Id.* ¶ 45. The FBI notified Plaintiff on August 6, 2019, that it had located approximately 2,378 pages of potentially responsive records. *Id.* ¶ 15. As of the end of 2021, the FBI still had not produced a single record to Plaintiff.

Plaintiff then filed this suit on January 4, 2022. *Id.* ¶ 23. Only after the court entered an order did the FBI start to process and produce records. *Id.* ¶ 24. Eventually, over the course of six months, the FBI processed a total of 2,501 responsive records, in paper and photographic form, as well as three DVDs of redacted digital video of the Dents Run dig. *Id.* ¶¶ 3, 25–32. Of the paper and photographic records, 1,534 were released in full, 565 were released in part, and 402 were withheld in full. *Id.* ¶ 3. Of those 402 records, the FBI withheld 50 based on FOIA exemptions and 352 as duplicates of previously processed records. *Id.* The three DVDs were redacted in part. *Id.* None of the produced records evidenced the discovery of gold.

## III.

Now before the court are the parties' cross-motions for summary judgment. Def.'s Mot. for Summ. J., ECF No. 36 [hereinafter Def.'s Mot.]; Pl.'s Cross-Mot. for Partial Summ. J., ECF No. 39 [hereinafter Pl.'s Mot.]. "FOIA cases typically and appropriately are decided on motions for summary judgment." *Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 136 (D.D.C. 2011). A government agency may obtain summary judgment in a FOIA case by relying on "relatively detailed" and "nonconclusory" declarations. *McGehee v. CIA*, 697 F.2d 1095, 1102

(D.C. Cir. 1983).  The court may enter summary judgment based solely upon information provided in affidavits or declarations when those affidavits or declarations describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exception, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).  "An agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Media Rsch.*, 818 F. Supp. 2d at 137 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal alteration omitted)).

Courts give agency declarations "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)).  Once the court determines that an agency has released all non-exempt material, it has no further judicial function to perform under FOIA, and the FOIA claim is moot.  *See Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982).

## IV.

### A.  Adequacy of Search

"The fundamental principle animating FOIA is public access to government documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999).  Accordingly, agencies are required "to make more than perfunctory searches and, indeed, to follow through on obvious leads to discover requested documents." *Id.*  While "[t]here is no requirement that an agency search every record system," an "agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  An agency satisfies its obligations under FOIA if it can show "beyond

material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"
*Valencia-Lucena*, 180 F.3d at 325 (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir.
1990)).  Importantly, "the adequacy of a FOIA search is generally determined not by the fruits of
the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v.
Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).

To obtain summary judgment, an "agency must show that it made a good faith effort to
conduct a search for the requested records, using methods which can be reasonably expected to
produce the information requested." *Oglesby*, 920 F.2d at 68.  That obligation is satisfied by "[a]
reasonably detailed affidavit, setting forth the search terms and the type of search performed, and
averring that all files likely to contain responsive materials . . . were searched." *Id.*  "The question
is not whether there might exist any other documents possibly responsive to the request, but rather
whether the *search* for those documents was *adequate* . . . [which] is judged by a standard of
reasonableness." *Steinberg v. Dep't of Just.*, 23 F.3d 548, 551 (D.C. Cir. 1994).

Plaintiff contends that the FBI fell short of conducting an adequate search because it
(1) "used search parameters that failed to meet the requirement to conduct a reasonable search";
(2) "failed to produce critical metadata associated with the photographs"; (3) "produced
photographs and videotapes that fall far short of its production burden in an apparent attempt to
conceal what it uncovered at Dents Run"; and (4) released an incomplete Enviroscan report.
Pl.'s Opp'n to Def.'s Mot. & Mem. of P & A in Support of Pl.'s Mot., ECF No. 39-1, at 8, 12, 14,
16 (cleaned up) [hereinafter Pl.'s Mem.].  The court addresses each argument in turn.

### 1.    Search Parameters

Plaintiff contends that the FBI's search was inadequate because it "used search parameters
that essentially ensured any search would not locate all responsive records." *Id.* at 8.  Plaintiff

highlights three specific search parameters as being inadequate: (1) the search terms, (2) the cut-off date, and (3) the database.  *Id.* at 8–10.

     *First*, Plaintiff argues that Defendant's decision to employ only two search terms rendered the search "facially underinclusive."  *Id.* at 8.  The two search terms were "Dents Run" and "Civil War gold."  *Id.*  Plaintiff highlights the omission of several possible search terms, including "Enviroscan," "Finders Keepers," and the FBI's term for the investigation, "Operation Union Gold."  *Id.* at 8–9.

     To prevail on summary judgment as to the adequacy of a search, the agency's affiant must disclose the search terms used to identify potentially responsive records.  *See Shapiro v. Dep't of Just.*, 40 F.4th 609, 612 (D.C. Cir. 2022).  Defendant's affiant, Michael G. Seidel, notes that the FBI used two search terms—"Dents Run" and "Civil War gold"—to conduct its initial search of Sentinel, the FBI's case management system.  *See* Seidel Decl. ¶¶ 41–42.  That search turned up "no main file records responsive to Plaintiff's FOIA request."  *Id.* ¶ 42.  Then, at Plaintiff's behest, Senator Pat Toomey's office reached out to the FBI about the "no records determination."  *Id.* ¶ 43.  The FBI then re-ran a search "for both main and cross reference records potentially responsive to the Plaintiff's request," which resulted in the discovery of "one main file . . . potentially responsive to Plaintiff's request."  *Id.* ¶ 44.  The FBI "processed [this] full investigative case file."  *Id.* ¶ 49.

     The shortcoming of this recitation is that Seidel never identifies the search terms that were used to locate the investigative case file.  He sets forth the search terms that did *not* turn up any records—"Dents Run" and "Civil War Gold"—but does not supply the terms used to find the "main file."  The court therefore is unable to make a judgement as to the adequacy of the second

search.  Summary judgment is denied as to this aspect of the search, and Defendant will be required to produce a supplemental declaration that identifies the relevant search terms.[1]

*Second*, Plaintiff argues that the FBI used an "unreasonable cut-off date of May 14, 2018," the date of the initial search.  Pl.'s Mem. at 9; Seidel Decl. ¶ 41.  Plaintiff asserts that the date-of-search is an unreasonable cut-off date because it enables the FBI to "benefit from its patently inadequate initial search" by "exclud[ing] any documents created or obtained after May 14, 2018." Pl.'s Mem. at 10.

The D.C. Circuit recently held that "it was reasonable for DOJ to use the date of its initial search as the cut-off date," because "the choice of a cut-off date need only be reasonable under the circumstances . . . ."  *Watkins L. & Advoc., PLLC v. Dep't of Just.*, 78 F.4th 436, 450 (D.C. Cir. 2023); *see also Public Citizen v. Dep't of State*, 276 F.3d 634, 644 (D.C. Cir. 2002) (finding that the defendant should "apply a date-of-*search* cut-off" to a FOIA request).  The problem here is that the only cut-off date identified by Defendant is the date of the initial FBI search—May 14, 2018—which produced *no records*.  Seidel Decl. ¶ 41.  Sometime after August 15, 2018, the FBI conducted another search that did yield responsive records, but Seidel does not identify the cut-off date for that successful search.  *Id.* ¶ 44.  The court therefore cannot assess whether the cut-off date used was "a reasonable way to effectuate" the purpose of the second search.  *Watkins L. & Advoc.*, 78 F.4th at 450 (finding that the agency's use of the same cut-off date for a second search after an initial search resulted in no records was reasonable because the agency had "explain[ed]" how the selected date was a "reasonable way to effectuate [the search's] purpose").  Summary judgment therefore is denied as to this aspect of the search, and Defendant will be required to

---

[1] Given Defendant's failure to disclose the actual search terms used, the court cannot evaluate whether the search was unreasonable for not using various terms proposed by Plaintiff, such as "Enviroscan," "Finders Keepers," "Rettew," and "Operation Union Gold."

produce a supplemental declaration that identifies the cut-off date used for the second search and justifies the reasonableness of that date.

*Third*, Plaintiff argues that Defendant should have expanded its search beyond the Sentinel indices. Plaintiff believes Defendant "failed to adequately explain why it limited its search to Sentinel beyond noting it 'was the most reasonable means for [Defendant] to locate records potentially responsive to Plaintiff's FOIA request.'" Pl.'s Mem. at 10 (quoting Seidel Decl. ¶ 40). Plaintiff argues that Defendant should not have ignored the possibility that "responsive records likely were in other files," particularly after Plaintiff "identified videotapes and DVDs that were missing from [Defendant's] production." *Id.* Similarly, Plaintiff contends that Defendant should not have ignored the implications of its search "fail[ing] to uncover any communications with Enviroscan" beyond the Enviroscan report, as well "copies of requisitions for expenditures associated with the Dents Run investigations." *Id.* at 10–11 ("Beyond the report that Enviroscan produced for the FBI there surely are contractual documents, billing statements, and communications between the two entities.").

It is of course true that "the agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency concluded an adequate search for the requested records." *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004). An agency, however, must "aver[] that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). The FBI did not do that here. Seidel simply identifies Sentinel as "the most reasonable means for the FBI to locate records potentially responsive to Plaintiff's FOIA request." Seidel Decl. ¶ 40. He does not state, for instance, that a file located in Sentinel would be expected to contain records of communications with an outside vendor, like Environscan, or

records reflecting investigation expenditures.  Plaintiff specifically demanded those records but received none.  The FBI's affidavit thus does not "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Valencia-Lucena*, 180 F.3d at 325 (internal quotation marks and citation omitted).  Summary judgment is denied as to this aspect of the search, and Defendant will be required to produce a supplemental declaration that states whether all files likely to contain responsive materials were searched.

### 2.   Metadata

Next, Plaintiff argues that the production was insufficient because the FBI did not produce metadata that would indicate the date and time of the photographs taken at the Dents Run site. Pl.'s Mem. at 12.  Plaintiff identifies the model of camera used to the take the photographs—a Nikon D700—and asserts, based on product instructions available online, "that [the] camera has time and date stamp functions that automatically display the time and date unless its user affirmatively disables those functions." *Id.*  The same is true when printing the photographs.  *Id.* Plaintiff acknowledges that Seidel justifies this exclusion because "the serialized photographs did not have specific date/time stamps," but expresses skepticism of his description of "serialized photographs" as "[f]ar from a categorical statement that no photographs had a time and date stamp." *Id.* at 12–13.

On this dispute, Defendant prevails.  Plaintiff offers only speculation that photographs with metadata must be available.  That is not enough to avoid summary judgment.  *See Watkins L. & Advoc.*, 78 F.4th at 446.

### 3.   Photographs and Videotapes

Plaintiff next contends that the FBI's production of "nearly 2,000 photographs" and "selected videotapes" from the Dents Run excavation was deficient in two ways.  Pl.'s Mem. at

14. First, the FBI allegedly "manipulated the photographs by printing them in black and white with low resolution and very high contrast." *Id.* Second, the photos and videos disclosed "do not capture the entirety of the dig or even critical aspects of the dig." *Id.* Specifically, Plaintiff questions why the FBI produced no video of the second day of the dig and why it disclosed no photographs of a large excavation pit that is described in the site sketch and a write-up prepared on the morning of the second day. *Id.* at 15–16.

Plaintiff has a point as to the videos, but not the photographs. Seidel explains that, after Plaintiff noted that a person videotaping the site could be seen in photographs already in the Paradas' possession, the FBI followed up and learned that the person depicted worked for the FBI's Office of Public Affairs ("OPA"). Seidel Decl. ¶ 48. That office "confirmed that they had an individual at the dig site who recorded 65 'video clips.'" *Id.* Those clips were produced to Plaintiff. Seidel offers no detail, however, as to *how* the OPA conducted its search. Without more, the court cannot evaluate whether the OPA's search was "reasonably calculated to uncover all relevant" videos. *Valencia-Lucena*, 180 F.3d at 325.[2]

As for the photographs, Seidel specifically states that "[t]he FBI processed for segregable release the collected photographs taken during the investigation." Seidel Decl. ¶ 47 n.12. Plaintiff has not offered any "countervailing evidence" that would raise "substantial doubt" about the agency's search for photographs. *Iturralde*, 315 F.3d at 314 (citations omitted). Nor has it offered any evidence to support the allegation that the FBI "manipulated" the black-and-white photographs. Also, the FBI eventually produced "specific photographs in high-resolution color," Seidel Decl. ¶ 50, as Plaintiff acknowledges, *see* Pl.'s Mem. at 15 (citing a "identical picture reproduced in color"). Summary judgment is granted as to the photographs and denied as to the

---

[2] Plaintiff also complains that the FBI did not provide an affidavit "from the videographer present during the excavation." Pl.'s Mem. at 16. Plaintiff is not entitled to the affiant of its choice.

video clips.  Defendant will be required to produce a supplemental declaration that states how the OPA conducted its search for the video clips.

4. *Enviroscan Report*

Finally, Plaintiff complains that the Enviroscan report "appears to be incomplete." *Id.* at 16.  Missing, Plaintiff says, "is a cross-section of the key target area located in the middle of the Enviroscan map" that is "the most likely area where gold would be found." *Id.* at 17.  But this is pure conjecture.  Plaintiff points to no missing pages, nothing out of sequence, or any other omission to support its contention that the Enviroscan report it received is incomplete.  Plaintiff therefore is not entitled to summary judgment on this issue.

**B.     Exemption 5**

Defendant invoked the deliberative process privilege under Exemption 5 to justify withholding "investigative site survey notes and sketches" created by FBI agents during "the preliminary investigation site visit at Dents Run."  Seidel Decl. ¶ 60.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  The primary focus in this case is the deliberative-process privilege. The deliberative-process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001). To qualify for the deliberative process privilege, the withheld information must be "both pre-decisional and deliberative." *Abtew v. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).  Material is "predecisional" if "it was generated before the adoption of an agency policy," and it is "deliberative" if "it reflects the give-and-take of the consultative process." *Coastal States*

*Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  Finally, it must be "reasonably [foreseeable] that disclosure would harm an interest protected by [Exemption 5]."  5 U.S.C. § 552(a)(8)(A)(i)(I).

Plaintiff does not dispute the pre-decisional nature of the notes and sketches but contests that they are deliberative.  Pl.'s Mem. at 18–20.  It argues that "the agency has fallen far short of its burden of demonstrating that the withheld material is decisional and not purely factual."  *Id.* at 19.

Although it is accurate to say that "factual information generally must be disclosed," the D.C. Circuit has "caution[ed] against reflexive fact/opinion characterization as the way to decide the full range of Exemption 5 cases."  *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992).  "The fact/opinion distinction . . . is not always dispositive; in some instances, 'the disclosure of even purely factual material may so expose the deliberative process within an agency' that the material is appropriately held privileged."  *Id.* at 1434 (citation omitted).  In the end, the question is whether the materials "bear on the formulation of exercise of agency policy-oriented *judgment*."  *Id.* at 1435; *see also id.* ("To the extent that predecisional materials, even if 'factual' in form, reflect an agency's preliminary positions or ruminations about how to exercise discretion on some policy matter, they are protected under Exemption 5.").

Seidel's description of the site survey notes and sketches fall short of establishing that they are part of a deliberative process.  Seidel states that those materials contain "thoughts, ideas, impressions, and visual interpretations (sketch of site location)."  Seidel Decl. ¶ 61.  He further explains that these "preliminary thoughts" are "edit[ed]" "for incorporation into a final FD-302 statement" and thus "are integral to the formation of[] the final FD-302 statement."  *Id.*  "The

handwritten notes . . . are considered a preliminary draft of the official FD-302 record serialized into the case file."  *Id.*

Although Seidel's description of the withheld materials bears hallmarks of deliberation, he never articulates what *judgment* agents made using these notes.  He does not say, for example, that the notes were a first step in formulating a final investigative plan reflected in the FD-302.  Such notes likely would have qualified as deliberative.  But so far as the court can tell, the agents did little more than record factual observations about the Dents Run site, which were later memorialized in the FD-302.  The mere fact that the notes were a precursor to a final report does not, without more, make them deliberative.  *See Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 367 (D.C. Cir. 2021) ("But to fall within the deliberative process privilege, the drafts must also be deliberative in content."); *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257–58 (D.C. Cir. 1982) ("Even if a document is a 'draft of what will become a final document,' the court must also ascertain 'whether the document is deliberative in nature.'") (quoting *Coastal States*, 617 F.2d at 866).

The court therefore grants summary judgment in Plaintiff's favor with respect to the materials withheld under Exemption 5.[3]  Defendant will be required to produce the investigative site survey notes and sketches created by FBI agents during the preliminary investigation site visit at Dents Run.

## C.    Exemptions 6 and 7(C)

Defendant invoked Exemption 6 and 7(C) to justify withholding the names and identifying information of FBI agents and professional staff, third parties mentioned in the investigative records, local law enforcement employees, individuals interviewed by the FBI during the

---

[3] Given this ruling, the court does not reach Plaintiff's alternative Exemption 5 argument that the FBI has failed to show that reasonably foreseeable harm would result from disclosure.  *See* Pl.'s Mem. at 20–22.

investigation, personnel from federal government agencies and commercial institution employees who assisted the FBI during the investigation, and third parties who were of investigative interest to the FBI.  *See* Def.'s Mem. of Law in Support of Def.'s Mot., ECF No., 36-1 at 15 [hereinafter Def.'s Mem.].  Plaintiff only contests one of Defendant's redactions under Exemption 6 and 7(C): the authors of the Enviroscan report.  *See* Pl.'s Mem. at 23.  Accordingly, summary judgement is granted with respect to Defendant's other Exemption 6 and 7(C) redactions.  *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6). Exemption 7 protects law enforcement records or information when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(c). Plaintiff does not contest that the Enviroscan Report was "compiled for law enforcement purposes," Pl.'s Mem. at 23–24, so the court focuses solely on the standard established under Exemption 7(C).  *See Roth v. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) (observing that in the case of law enforcement records "we would have no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)").

Exemption 7(C) requires a balancing of privacy interests against the public interest in disclosure.  *See Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 762 (1989). The only relevant public interest for the purposes of this balancing is "the citizens' right to be

informed about what their government is up to."  *Beck v. Dep't of Just.*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (quoting *Dep't of State v. Ray*, 502 U.S. 164, 177 (1991)).

Seidel asserts that identifying the names of "commercial institution employees who provided assistance to the FBI" "could subject them to unofficial inquiries for information related to their assistance, not anticipated by their contact with the FBI."  Seidel Decl. ¶ 77.  He further states that "there is no public interest to be served by publicly disclosing their identities as doing so would not increase public understanding of FBI operations and activities."  *Id.*  Plaintiff disputes these contentions.  It says that the FBI has never hidden Enviroscan's role in this matter, and there is a public interest in the authors' identity, "as they could provide critical evidence explaining why, despite their highly sophisticated equipment and considerable expertise, their gravimeter scan results were so wrong, if in fact they were wrong."  Pl.'s Mem. at 24.

The court affirms the withholding.  The fact that the FBI may not have obscured Enviroscan's participation in the investigation does not diminish the privacy interests of its employees.  The D.C. Circuit has long recognized that "government officials," including FBI agents, "have a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives."  *Baez v. Dep't of Just.*, 647 F.2d 1328, 1339 (D.C. Cir. 1980).  It stands to reason that an employee of a company hired by the FBI to assist in an investigation has at least the same privacy interest.  Moreover, the claimed public interest is minimal, at best.  Plaintiff does not articulate what "incremental value" would be gained from disclosing the report authors' names.  *See Schrecker v. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003) (stating that the public-interest inquiry "should focus not on the general public interest in the subject matter of the FOIA request, but rather on the incremental value of the specific information being withheld").  The public already knows that Enviroscan

17

prepared the report.  Plaintiff does not explain how the public will be better informed of what the government is "up to" by disclosing the report authors' names.  The authors' clear personal privacy interest against disclosure therefore outweighs what is at best a nominal public interest in the authors' names.

### D.    Exemption 7(E)

Defendant invoked Exemption 7(E) to justify withholding (1) "security fax numbers, non-published internal FBI phone numbers, internal e-mail and IP addresses, non-public intranet web addresses, and secure internal e-mail tools"; (2) "methods and techniques involving the location and identity of FBI units, and squads involved in the investigation"; (3) "sensitive investigative database information and search results located through queries of its e-tip database used for official law enforcement purposes by the FBI"; (4) "sensitive investigative file numbers"; (5) "details of FBI Operational Plans"; and (6) "specific sensitive collection methodology for collection of evidence the FBI used during this investigation."  Def.'s Mem. at 21–22.

Exemption 7(E) protects records compiled for law enforcement purposes "to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  Plaintiff only contests Defendant's withholding of FBI Operational Plans under Exemption 7(E).  *See* Pl.'s Mem. at 24–26.  Therefore, summary judgement is granted with respect to Defendant's other Exemption 7(E) redactions. *See Hopkins*, 284 F. Supp. at 25.

Defendant redacted details of FBI Operational Plans, which "*often include* strategies for surveillance, placement of personnel, communications during the operations, contingency/abort

18

plans, administrative and equipment information, targets' background information (maps, photographs, copies of search writs, etc.), local emergency medical facility information and routes, briefing/staging locations, and/or other specific instructions for the operations." Seidel Decl. ¶ 93 (emphasis added). These Operational Plan details are not "publicly known." *Id. See Albuquerque Publ'g Co. v. Dep't of Justice*, 726 F. Supp. 851, 857 (D.D.C. 1989) (Exemption 7(E) protects "investigative techniques and procedures generally unknown to the public").

Plaintiff counters that Defendant's justification for invoking Exemption 7(E) is lacking. It contends that Defendant has "proffered a generic description of the withheld material" and has failed to provide any explanation of which techniques and procedures are involved in this particular case. Pl.'s Mem. at 24–25. The court agrees.

To justify an invocation of Exemption 7(E) an agency must identify "what procedures are at stake" and how disclosure of the withheld material "could reveal such procedures." *Citizens for Resp. & Ethics in Washington ("CREW") v. Dep't of Just.*, 746 F.3d 1082, 1102 (D.C. Cir. 2014). Here, Seidel identifies multiple strategies that are "often" included in an operational plan, but he never states whether any one of the listed examples are in fact contained in the Dents Run operational plan. Seidel Decl. ¶ 93. The FBI likely does not often search for buried treasure, so providing the court with a generic list of possible procedures is not enough. Defendant must "provide *some* explanation of what procedures are involved and how they would be disclosed." *CREW*, 746 F.3d at 1102. It has not done so here.

In light of the court's conclusion that the Seidel declaration does not specify the actual investigative techniques it seeks to protect by withholding the Operational Plan, it would be premature of the court to decide whether Defendant has met the "relatively low bar" for the circumvention-of-law element. *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011). The court

only notes that, once an actual technique contained in the Plan is identified, Defendant must "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Id.* (citation omitted).  Defendant will be required to produce a supplemental declaration that identifies the investigative techniques it seeks to protect by withholding the Operational Plan.[4]

### E.   Reasonably Segregable Material

Defendant argues that "every effort was made to provide Plaintiff with all information in the public domain and with all reasonably segregable, non-exempt information."  Def.'s Mem. at 25.  Perhaps so.  But in view of the above rulings, the court defers consideration of the agency's segregability finding until any additional searches and remaining deficiencies are addressed.

## V.

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 36, is granted in part and denied in part.  So, too, is Plaintiff's Cross-Motion for Partial Summary Judgment, ECF No. 39.  The court also defers as to various aspects of the motions.

Defendant's motion is granted with respect to the personally identifying information withheld pursuant to Exemptions 6 and 7(C), but denied as to withholdings pursuant to Exemption 5.  Plaintiff's motion is conversely denied and granted as to those same exemptions. Defendant shall produce the investigative site survey notes and sketches to Plaintiff.

As to the remaining disputes, Defendant is hereby ordered to prepare a supplemental declaration that (1) identifies the search terms used for the second search, (2) identifies the cut-off date used for the second search and a justification for the reasonableness of that date, (3) states whether all files likely to contain responsive materials were searched for communications with

---

[4] The court elects to order a supplemental declaration at this time, instead of compelling disclosure, to avoid possible disclosure of sensitive law enforcement information.

Enviroscan and records reflecting investigation expenditures, (4) states how the Office of Public Affairs conducted its search for the video clips produced, and (5) identifies the actual investigative techniques it seeks to protect by withholding the Operational Plan.

Defendant shall produce the supplemental declaration to Plaintiff by October 27, 2023. Thereafter, by November 10, 2023, the parties shall file a Joint Status Report that advises whether any disputed issues remain and, if so, proposes a schedule for further proceedings.

Dated:  September 27, 2023

_____
Amit P. Mehta
United States District Court Judge