UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FINDERS KEEPERS USA, LLC,** ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> **UNITED STATES** ) <br> **DEPARTMENT OF JUSTICE,** ) <br> ) <br> Defendant. ) <br> ) | Case No. 22-cv-00009 (APM) |

## MEMORANDUM OPINION AND ORDER

### I.

This Freedom of Information Act ("FOIA") case is back before the court after it granted in part and denied in part Defendant Department of Justice's initial motion for summary judgment. *See Finders Keepers USA, LLC v. U.S. Dep't of Just.*, No. 22-cv-00009 (APM), 2023 WL 9024618, at *10 (D.D.C. Sept. 27, 2023). The court assumes the parties' and reader's familiarity with its earlier decision and therefore does not set forth the background of the case.

The court denied Defendant summary judgment as to certain issues and directed it to supplement the record as to the following: (1) the adequacy of the search for responsive records, *id.* at *4; (2) the reasonableness of the selected search cut-off date, *id.*; (3) the justification for limiting the search to the Federal Bureau of Investigation's ("FBI") Central Records System via its Sentinel Indices, *id.* at *5; (4) the adequacy of the search for videotape footage, *id.* at *6; and (5) the basis for the invocation of Exemption 7(E) to withhold portions from an Operational Plan document, *id.* at *9. Defendant has attempted to address these identified deficiencies with the Fifth Declaration of Michael G. Seidel, and it once more moves for summary judgment.

*See* Def.'s Mem. of Law in Supp. of Suppl. Mot. for Summ. J., ECF No. 49 [hereinafter Def.'s Mot.]; *id.*, Fifth Decl. of Michael G. Seidel, ECF No. 49-2 [hereinafter Fifth Seidel Decl.].

Plaintiff Finders Keepers has cross-moved for summary judgment. *See* Pl.'s Renewed Cross-Mot. for Partial Summ. J. [hereinafter Pl.'s Cross-Mot.], ECF No. 51, Mem. of P. & A. in Opp'n to Def.'s Mot. and in Supp. of Pl.'s Cross-Mot., ECF No. 51-1 [hereinafter Pl.'s Opp'n].

For the reasons that follow, the parties' motions are granted in part and denied in part.

## II.

### A.

The court previously denied summary judgment as to the adequacy of Defendant's search for three reasons. *See Finders Keepers*, 2023 WL 9024618, at *4–5. The first was that Defendant failed to identify the search terms used to locate responsive materials, after an initial search turned up no records. *Finders Keepers*, 2023 WL 9024618, at *4. Seidel now explains that the FBI used the search term "Gold at Dents Run" to search its Sentinel Indices for a second time to locate records within the Central Records System ("CRS"). Fifth Seidel Decl. ¶ 6. The FBI also performed additional searches using terms suggested by Plaintiff, including "Finders Keepers," "Dents Run, Elk County, PA," "Civil War gold," "Enviroscan," "Dennis Parada," and "Operation Union Gold." *Id.* ¶ 8. These searches produced no new records. *Id.*

The court finds that the search terms used by the FBI were "reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). Plaintiff offers no argument to the contrary. *See generally* Pl.'s Opp'n at 3–6.

B.

The court declined to approve the adequacy of the search for the added reason that Defendant did not identify the cut-off date that it used to conduct the second search. *See Finders Keepers*, 2023 WL 9024618, at *4. Seidel now states that the FBI used as the cut-off date May 14, 2018, the date of its initial unsuccessful search. Fifth Seidel Decl. ¶ 6. Defendant says that using this date was reasonable "because it was the date the FBI started its search," and the date of search is the cut-off date noticed on its FOIA website. Def.'s Opp'n to Pl.'s Cross-Mot. and Reply in Supp. of Def.'s Mot., ECF No. 54 [hereinafter Def.'s Reply], at 4–5; *see also* Fifth Seidel Decl. ¶ 6; Def.'s Mot. at 10.

The court is unpersuaded. As previously noted, the D.C. Circuit has "held that 'it [is] reasonable for DOJ to use the date of its initial search as the cut-off date,' because 'the choice of a cut-off date need only be reasonable *under the circumstances*.'" *Finders Keepers*, 2023 WL 9024618, at *4 (quoting *Watkins L. & Advoc., PLLC v. U.S. Dep't of Just.*, 78 F.4th 436, 450 (D.C. Cir. 2023) (emphasis added)). In *Watkins Law*, the court found that use of the first search date was reasonable because "[t]he object of the supplemental search was to expand the search terms beyond those used in the initial search." 78 F.4th at 450. Here, by contrast, the second search was not an effort to "expand" the initial search parameters. Rather, it was a new search that came about only after U.S. Senator Pat Toomey interceded on Plaintiff's behalf. *See Finders Keepers*, 2023 WL 9024618, at *2. The FBI treated Senator Toomey's inquiry "as an official appeal," Notice of Filing, ECF No. 37, Fourth Decl. of Michael G. Seidel, ECF No. 37-1 [hereinafter Fourth Seidel Decl.], ¶ 6, considered it to be a "lead," and "determined another search of the CRS automated indices was necessary, as a reasonable means for the FBI to locate records potentially responsive to Plaintiff's FOIA request," *id.* ¶ 44. In these circumstances, it was unreasonable for Defendant to

3

view the second search as a mere extension of the first and to adopt the first search's cut-off date. The FBI therefore should have looked for records up through the date of the second search—which occurred sometime before October 15, 2018. *Id.*

Plaintiff asks the court to go further and order an even later cut-off date—July 24, 2019—more than nine months after the second search. Pl.'s Opp'n at 8. That is the date on which the FBI formally closed its investigation and agreed to release responsive materials that it previously had withheld in full under Exemption 7(A). *See id.*; Fourth Seidel Decl. ¶¶ 44, 46. But a cut-off date's reasonableness must be assessed as of when the search itself occurs. Post-search events that come to light during litigation have no bearing on that assessment. *See Edmonds Inst. v. U.S. Dep't of Interior*, 383 F. Supp. 2d 105, 111 (D.D.C. 2005) (finding that a plaintiff's proposal of using a document release cut-off date was "inherently flawed, leading as it would to an ever-moving target for the production of documents under FOIA"); *cf. Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991) ("To require an agency to adjust or modify its FOIA responses based on post-response occurrences could create an endless cycle of judicially mandated reprocessing.").

## C.

The third ground on which the court denied summary judgment as to search adequacy was the FBI's failure to explain why all files likely to contain responsive material would be discovered from a search of the Sentinel Indices. *See Finders Keepers*, 2023 WL 9024618 at *5. According to Seidel, "Sentinel is the FBI's case management system." Fourth Seidel Decl. ¶ 38. Seidel now explains that the FBI's Records and Information Management Policy Guide, dated September 22, 2022, "requires all FBI personnel to serialize any non-transitory investigatory records of investigative importance concerning a particular investigation to the case file of the investigation."

Fifth Seidel Decl. ¶ 11.[1]  "[A] Sentinel search of the [Central Records System] would be expected to contain records . . . deemed of investigative importance by FBI personnel." *Id.*  According to Seidel, the agency confirmed that its Philadelphia Field Office, which led the Dents Run investigation, "followed the Policy Guide, and serialized all records deemed of investigative importance" to the relevant case file. *Id.*  Seidel also responds to an earlier criticism from Plaintiff, renewed again in its Opposition, that the records produced did not contain any documents reflecting expenses associated with the Dents Run dig. *See Finders Keepers*, 2023 WL 9024618 at *5; *see also* Pl.'s Opp'n at 5.  He suggests that agents might have considered such records to be "transitory" and, for that reason, they would not be contained in the CRS.  Fifth Seidel Decl. ¶ 11.

Seidel's latest explanation for limiting the search to the CRS remains deficient for two reasons.  First, as Plaintiff points out, the Dents Run dig took place in March 2018, when the cited Policy Guide—dated September 2022—was not in effect.  Pl.'s Opp'n at 4.  Seidel does not say whether agents were subject to similar preservation policies four years earlier.  Defendant responds that "Plaintiff has provided no evidence that this policy has changed in any way since 2018," *see* Def.'s Reply at 8, but that argument gets it backwards; it is "the agency [that] bears the burden of establishing that any limitations on the search it undertakes in a particular case comport with its obligation to conduct a reasonably thorough investigation," *McGehee v. CIA*, 697 F.2d 1095, 1101 (D.C. Cir. 1983).

---

[1] According to Seidel:

> Non-transitory records are records needed for more than 180 days and possess one or more of the following characteristics: contains information necessary to adequately and properly document the activities and functions of the agency; provides documentation of agency decisions and commitments reached orally (person-to-person, phone, video, or in conference[)]; conveys information of value on agency activities and adds understanding of agency operations and responsibilities; documents the formulation and execution of policies and decisions; and/or provides proof of fiscal or legal rights and obligations.

Fifth Seidel Decl. ¶ 11 n.4.

Second, Plaintiff did not limit its request to "non-transitory investigative records." Seidel does not, for instance, exclude the possibility that agents in the Philadelphia Field Office saved "transitory" responsive materials, like email communications or records of expenditures. Nor does he describe any effort to determine whether such materials might exist in the Philadelphia Field Office or elsewhere. That omission rendered the search inadequate. *See Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (vacating dismissal order where it was "not clear from [the agency's] affidavit that the Central Records system is the *only* possible place that responsive records are likely to be located").

### III.

The FBI produced to Plaintiff three DVDs of videos of the Dents Run dig. Fifth Seidel Decl. ¶ 13. The court denied summary judgment as to the search for videos because Seidel did not detail "*how* the [Philadelphia Field Office's Public Affairs Office ("PAO")] conducted its search." *Finders Keepers*, 2023 WL 9024618 at *6 (emphasis in original). Seidel now explains that, upon inquiry, the PAO reported that the FBI representatives who filmed the dig returned the camera to "the FBI.gov and Internet Operations Unit," and members of that Unit advised that the original video files were saved on a hard drive and "provided those video *files* to [the Record/Information Dissemination Section ("RIDS")]." Fifth Seidel Decl. ¶ 12 (emphasis added). "The processed video *clips*," Seidel states, "were processed and released on three DVDs" to Plaintiff. *Id.* ¶ 13 (emphasis added).

Plaintiff makes much of Seidel's word choice. It complains that "[m]issing from Mr. Seidel's declaration is any explanation for how video and video files provided to RIDS were transformed into 'processed video clips' that in turn were processed for release to Plaintiff." Pl.'s Opp'n at 11. But there is no reason to think that, through a subtle change of wording, Seidel

6

meant to distinguish between "video files" and "video clips." Seidel previously explained that the FBI representative who filmed the dig "recorded 65 'video clips.'" Fourth Seidel Decl. ¶ 48. Those clips, totaling a run time of more than 43 minutes, were released to Plaintiff on three DVDs, with some information withheld under Exemptions 6 and 7(C). *Id.*; Def.'s Initial Mot. for Summ. J., ECF No. 36, Ex. Z, ECF No. 36-3, at 1, 104. Plaintiff thus received all the non-exempt video taken of the Dents Run dig in the FBI's possession. The court is now satisfied with the agency's search for that material.

### IV.

Next, the court addresses two issues regarding the FBI's release of the Dents Run Operational Plan.

### A.

The first is that the Plan released to Plaintiff seemingly is an "Updated" version dated "3/13/2019," which is one year *after* the Dents Run dig. Fifth Seidel Decl., Ex. B, ECF No. 49-2, at 96 (CM/ECF pagination). Plaintiff asks the court to "order the FBI to immediately produce . . . all versions of the Operational Plan[.]" Pl.'s Opp'n at 9. Defendant offers no response to this argument, *see* Def.'s Reply at 9–11, so the court finds that there is a genuine dispute of fact as to whether the FBI possesses earlier versions of the Operational Plan.

### B.

The second issue is Defendant's withholding of certain information under Exemption 7(E). Exemption 7(E) permits withholding of information contained in law enforcement records that "would disclose techniques and procedures for law enforcement investigations or prosecutions . . . if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The court previously rejected Defendant's invocation of Exemption 7(E) as to the

Dents Run Operational Plan because "the Seidel declaration [did] not specify the actual investigative techniques" contained in the record. *Finders Keepers*, 2023 WL 9024618 at *9. Seidel now clarifies that the Operational Plan contains "1) information specifically about the Dents Run Seizure revealing non-public details of plan execution; and 2) additional details contained in the plan that, though not applicable to the seizure execution here, would disclose additional techniques and procedures considered for use in other investigative scenarios." Fifth Seidel Decl. ¶ 15. Plaintiff continues to challenge only the first category of withholdings. Pl.'s Opp'n at 9.

As to that information, Plaintiff argues that "revealing operational details about how the FBI conducted a dig at Dents Run presents no risk of future harm to FBI investigations or FBI agents and other law enforcement personnel," because "[t]he uniqueness of the investigative matter at issue also means it is unlikely to reoccur." *Id.* at 10. Plaintiff further contends that Defendant fails to satisfy FOIA's "foreseeable harm" requirement, *see* 5 U.S.C. § 552(a)(8)(A)(i), as "the FBI relies on precisely the kind of generic, boilerplate assertions courts have rejected as falling short of the foreseeable harm requirement." Pl.'s Opp'n at 12.[2] The court agrees with Plaintiff on both counts.

Seidel appears to identify the following Dents Run-specific investigative techniques within the Operational Plan that were withheld:

> strategies for surveillance, placement of personnel, assigned duties and investigation tasks of these personnel, communication channels and equipment used during the operation, contingency/abort plans in case of operation disruptions, certain administrative and equipment information, coordination instructions for the multiple agencies (local and federal) involved in the investigation, and local emergency medical facility information, routes and coordination, and the medical operation plans.

---

[2] Plaintiff also argues that some of the information likely withheld is already in the public domain. Pl.'s Opp'n at 10. The court does not reach this issue, as it agrees with Plaintiff on other grounds.

Fifth Seidel Decl. ¶ 15. He then goes on to say that "[r]elease of the exempt information would provide criminals with a complete playbook of all possible law enforcement considerations when executing investigative tasks." *Id.* "This could not only compromise the safety of law enforcement personnel executing the actions, it could also reasonably be expected to risk circumvention of the law by allowing criminals to alter behavior to avoid detection or disrupt FBI law enforcement operations." *Id.*

These statements fall short of sustaining the Exemption 7(E) withholdings because they fail to "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (internal quotation marks and citation omitted). Part of the difficulty with Seidel's declaration is that he does not separate out the expected harm from disclosing Dents Run-specific techniques in the Operational Plan versus those that are generally set forth. Seidel indivisibly states as to both categories that disclosure might allow criminals to change their behavior or disrupt law enforcement operations. Fifth Seidel Decl. ¶ 15. Such representations are often enough to clear Exemption 7(E)'s "low bar." *Blackwell*, 646 F.3d at 42; *see also, e.g., Kowal v. U.S. Dep't of Just.*, 107 F.4th 1018, 1033 (D.C. Cir. 2024); *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 205 (D.C. Cir. 2014). But here there is not an obvious "logical" connection between the techniques specific to an operation to dig for gold and how their disclosure would enable bad actors to circumvent the law in the future or endanger agents. Surely, it is not common for the FBI to oversee an operation that requires the removal of large amounts of earth to look for a thing of value. The court therefore cannot assess, even granting proper deference to the judgment of law enforcement, whether disclosure could increase the risk of future evasions of the law.

For similar reasons, Seidel's representations do not meet FOIA's "foreseeable harm" standard. That requirement "impose[s] an independent and meaningful burden on agencies." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (internal quotation marks and citation omitted) (alteration in original). An agency "must provide 'a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede' the interests protected by a FOIA exemption." *Leopold v. U.S. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024) (quoting *Reps. Comm.*, 3 F.4th at 370). Put differently, the "burden is on the Department to present reasoned grounds to support a district court's ruling in its favor." *Id.* (citation omitted). "[G]eneralized assertions" are not enough. *Reps. Comm.*, 3 F.4th at 369 (citation omitted). Here, again, Seidel offers no facts that would enable the court to evaluate the "foreseeability" of the harm that he forecasts could result from release of information specific to the Dents Run operation. His justifications for the withholdings instead are generic and seemingly tailored to the non-specific techniques. Defendant thus fails to make the "focused and concrete" showing required to satisfy the "foreseeable harm" requirement.

In light of the insufficiency of the agency affidavits, the court will exercise its discretion and review *in camera* the Operational Plan—including all prior versions—before making a final judgment on Defendant's withholdings under Exemption 7(E). *See Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996) (stating that "*in camera* review may be particularly appropriate when . . . the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims").

V.

Lastly, Defendant again argues that it has satisfied its requirement to disclose all reasonably, segregable, non-exempt information. *See* 5 U.S.C. § 552(b)(9); Def.'s Mot. at 17–18. The court deferred ruling on this issue last time. *See Finders Keepers*, 2023 WL 9024618, at *10. Seidel twice attested to having conducted a sufficient segregability analysis of the withheld materials. *See* Fifth Seidel Decl. ¶ 19; Fourth Seidel Decl. ¶ 96. The court notes that Plaintiff does not challenge this contention directly in supplemental briefing, nor did it in initial briefing. *See generally* Pl.'s Opp'n; Pl.'s Cross-Mot. for Partial Summ. J., ECF No. 39. However, courts have "an affirmative duty to consider the segregability issue *sua sponte*." *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1027 (D.C. Cir. 1999). The court therefore must determine whether the government met its segregability burden as to those exemptions that are either unchallenged or the court found to be properly invoked.

A "comprehensive *Vaughn* index, along with an affidavit that a line-by-line segregability review of each document withheld in full," is "sufficient to fulfill the agency's obligation to show that further segregability was not feasible." *Citizens for Resp. and Ethics in Wash. v. U.S. Dep't of Justice*, 160 F. Supp. 3d 226, 245 (D.D.C. 2016); *see also Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("In order to demonstrate that all reasonably segregable material has been released, the agency must provide a 'detailed justification' for its non-segregability. However, the agency is not required to provide so much detail that the exempt material would be effectively disclosed.") (citing *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force,* 566 F.2d 242, 261 (D.C. Cir. 1977)). Defendant has met that obligation with respect to the information withheld under Exemptions 6 and 7(C) and the non-Operational Plan specific withholdings under Exemption 7(E). *See Finders Keepers*, 2023 WL 9024618, at *8–9.

## VI.

For the foregoing reasons, the parties' motions are granted in part and denied in part. Defendant's motion is granted as to (1) the search terms used to perform the search and (2) the adequacy of the search for video footage of the Dents Run Operation. Plaintiff's motion is granted as to (1) the search cut-off date and (2) limiting the scope of the search to the Sentinel Indices.

On remand, Defendant shall re-run its search of the Sentinel Indices for responsive records as of the date of the second search. Further, Defendant shall determine whether any "transitory" responsive records might be found in the FBI's Philadelphia Field Office or elsewhere. It also shall confirm whether there exist versions of the Operational Plan pre-dating March 13, 2019. Finally, after it has conducted these additional searches, Defendant shall produce to the court for *in camera* review all versions of the Operational Plan. Defendant shall redact from the Plan the law enforcement techniques that are unique to the Dents Run Operation and highlight those that are Operation-specific.

The parties shall file a Joint Status Report by April 14, 2025, which updates the court on Defendant's efforts to comply with the court's orders.

Dated: March 14, 2025

Amit P. Mehta
United States District Judge